UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT BERG, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | Case No. _____ |
| ) v. ) ) | JURY TRIAL DEMANDED |
| AKORN, INC., JOHN N. KAPOOR, KENNETH S. ABRAMOWITZ, ADRIENNE L. GRAVES, RONALD M. JOHNSON, STEVEN J. MEYER, TERRY A. RAPPUHN, BRIAN TAMBI, ALAN WEINSTEIN, RAJ RAI, FRESENIUS KABI AG, and QUERCUS ACQUISITION, INC., ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. ) | |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction announced on April 24, 2017 (the "Proposed Transaction"), pursuant to which Akorn, Inc. ("Akorn" or the "Company") will be acquired by Fresenius Kabi AG ("Parent") through Parent's wholly-owned subsidiary, Quercus Acquisition, Inc. ("Merger Sub," and together with Parent, "Fresenius").

2. On April 24, 2017, Akorn's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, Fresenius will acquire all of the outstanding shares of Akorn common stock for $34.00 per share in cash.

3.      On May 22, 2017, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement, and that the stockholder vote should be enjoined until defendants disclose the material information sought herein.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Akorn common stock.

9.      Defendant Akorn is a Louisiana corporation and maintains its principal executive offices at 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.  Akorn's common stock is

traded on the NasdaqGS under the ticker symbol "AKRX."

10. Defendant John N. Kapoor ("Kapoor") is a director of Akorn and has served as Chairman of the Board since October 1990.

11. Defendant Kenneth S. Abramowitz ("Abramowitz") is a director of Akorn.

12. Defendant Adrienne L. Graves ("Graves") is a director of Akorn.

13. Defendant Ronald M. Johnson ("Johnson") has served as a director of Akorn since May 2003.

14. Defendant Steven J. Meyer ("Meyer") has served as a director of Akorn since June 2009.

15. Defendant Terry A. Rappuhn ("Rappuhn") has served as a director of Akorn since April 2015.

16. Defendant Brian Tambi ("Tambi") has served as a director of Akorn since June 2009.

17. Defendant Alan Weinstein ("Weinstein") has served as a director of Akorn since July 2009.

18. Defendant Raj Rai ("Rai") was appointed Interim Chief Executive Officer ("CEO") of the Company in June 2009, and was appointed CEO in May 2010.

19. The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

20. Defendant Parent is a German stock corporation and a party to the Merger Agreement.

21. Defendant Merger Sub is a Louisiana corporation, a wholly-owned subsidiary of Parent, and a Party to the Merger Agreement.

## **CLASS ACTION ALLEGATIONS**

22. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Akorn (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

23. This action is properly maintainable as a class action.

24. The Class is so numerous that joinder of all members is impracticable. As of the close of business on April 21, 2017, there were approximately 124,533,605 shares of Akorn common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

25. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

26. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

27. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

28. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

29. Akorn is a specialty generic pharmaceutical company that develops, manufactures, and markets generic and branded prescription pharmaceuticals and branded as well as private-label over-the-counter consumer health products and animal health pharmaceuticals.

30. The Company is an industry leader in the development, manufacturing, and marketing of generic pharmaceutical products in alternate dosage forms.

31. The Company's research and development efforts are primarily focused on the development of multisource generic products that are in dosage forms other than oral solid dose. The Company considers dosage forms outside of oral solid dose to be "alternate dosage forms." These products typically have fewer competitors in mature markets, are more difficult to develop and manufacture, and can carry higher profitability over time than oral solid dose products. The alternate dosage form products that Akorn focuses on are primarily those that it can manufacture, namely: ophthalmics, injectables, oral liquids, otics, topicals, inhalants, and nasal sprays.

32. Four of the Company's five manufacturing facilities are Food and Drug Administration ("FDA") approved, including its: (i) Decatur, Illinois facility, which specializes in sterile products, primarily injectables; (ii) Somerset, New Jersey facility, which specializes primarily in sterile ophthalmic products; (iii) Amityville, New York facility, which specializes in topical creams, gels and ointments, oral liquids, otic liquids, nasal sprays, and unit dose oral liquid

products; and (iv) Hettlingen, Switzerland facility, which specializes primarily in sterile ophthalmic products. All of Akorn's FDA approved facilities have been inspected by the FDA.

33. Additionally, the Company's Paonta Sahib, Himachal Pradesh, India facility is a sterile injectable facility with separate areas dedicated to general injectable products, carbapenem injectable products, cephalosporin injectable products, and hormonal injectable products. In addition, the cephalosporin area of the facility has the ability to produce non-sterile oral cephalosporin products. The Company is actively pursuing FDA approval of this facility.

34. Akorn markets a diverse portfolio of generic prescription pharmaceutical products, branded prescription pharmaceutical products, OTC brands, various formulations of private-label OTC pharmaceutical products, and a number of prescription animal health products. For its human prescription products, Akorn's diverse portfolio of alternate dosage form products sets it apart from larger competitors and allows it to provide a single source of these products for its customers. The OTC and animal health portfolios are largely complementary to the human prescription products, allowing the Company to leverage its manufacturing and development expertise.

35. Akorn maintains a targeted sales and marketing infrastructure to promote its branded, generic, OTC, and animal health products. The Company leverages its sales and marketing infrastructure to not only promote its branded portfolio, but also to sell its multisource generic products directly into physician offices, hospital systems, and group purchasing organizations.

36. On March 1, 2017, Akorn issued a press release wherein it reported its fourth quarter and full year 2016 financial results. Among other things, Akorn reported revenues of $284 million for the fourth quarter, representing an increase of $4 million over the fourth quarter of 2015. Full year 2016 revenues of $1,117 million represented an increase of $132 million, or

13.4%, over prior-year revenues of $985 million. GAAP net income for the full year 2016 was $184 million, or $1.47 per diluted share, compared to GAAP net income of $151 million, or $1.22 per diluted share, in the prior year.

37. Additionally, during the fourth quarter, the Company received three Abbreviated New Drug Application ("ANDAs") approvals: (i) Ibuprofen 100mg/5mL Oral Suspension that launched in November 2016; (ii) Azelastine Hydrochloride Ophthalmic Solution, 0.05% that launched in January 2017; and (iii) Triamcinolone Acetonide Topical Aerosol, 0.147 mcg/mL that the Company is planning to launch in 2017. The Company also opened a new research and development center in Cranbury, NJ, and submitted twelve ANDAs to the FDA.

38. With respect to the results, Individual Defendant Rai commented:

> We are pleased with our performance in 2016. First and foremost, we completed the restatement of our 2014 financials and became current with our SEC filings, which in itself was a major accomplishment. In 2016, we achieved record revenues, surpassing a billion dollars and solidifying Akorn's position among the top specialty generics companies with manufacturing roots in the United States. This would not have happened without the collective efforts and dedication of all Akorn employees.
>
> Our focus in 2017 and beyond remains consistent with our growth strategy of diversifying our portfolio, thus reducing product concentration through harvesting and replenishing our pipeline, deploying capital to consummate smart acquisitions through business development efforts and continuing to invest in our infrastructure. Finally, we remain optimistic about both the short and long-term prospects of our business despite the headwinds in our industry.

39. Nevertheless, the Individual Defendants caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

40. The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely

constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 5.02(a) of the Merger Agreement states:

> (a) Except as permitted by this Section 5.02, the Company shall and shall cause each of its Subsidiaries and its and their officers and directors to, and shall instruct and use its reasonable best efforts to cause its other Representatives to, (i) immediately cease any solicitation, discussions or negotiations with any Persons with respect to a Takeover Proposal that existed on or prior to the date hereof and (ii) from the date hereof until the Effective Time or, if earlier, the termination of this Agreement in accordance with Article VII, not, directly or indirectly, (A) initiate, solicit, or knowingly encourage (including by way of furnishing non-public information) the submission of any inquiries regarding, or the making of any proposal or offer that constitutes, or would reasonably be expected to lead to, a Takeover Proposal, (B) engage in, continue or otherwise participate in any discussions or negotiations regarding (except to notify any Person of the provisions of this Section 5.02), or furnish to any other Person any non-public information in connection with, or for the purpose of, encouraging a Takeover Proposal or (C) enter into any letter of intent, memorandum of understanding, agreement in principle, merger agreement, acquisition agreement or other similar agreement providing for a Takeover Proposal. The Company shall promptly request the return or destruction of all information furnished by or on its behalf to any Person and its Representatives with respect to a Takeover Proposal on or prior to the date hereof.

41. Further, the Company must promptly advise Fresenius of any proposals or inquiries received from other parties. Section 5.02(c) of the Merger Agreement provides:

> (c) The Company shall promptly (and in any event within 24 hours after knowledge of receipt by an officer or director of the Company) notify Parent in the event that the Company or any of its Subsidiaries or any of its or their Representatives receives a Takeover Proposal and shall disclose to Parent the material terms and conditions of any such Takeover Proposal and the identity of the Person or group of Persons making such Takeover Proposal and shall provide Parent with copies of any documents evidencing or delivered in connection with such Takeover Proposal, and the Company shall keep Parent reasonably informed promptly (and in any event within 24 hours after knowledge of the applicable developments by an officer or director of the Company) of any material developments with respect to any such Takeover Proposal (including any material changes thereto and including by providing copies of any revised or new documents evidencing or delivered in connection with such Takeover Proposal). For the avoidance of doubt, all information provided to Parent pursuant to this Section 5.02(c) will be subject to the terms of the Confidentiality Agreement.

42. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Fresenius a "matching right" with respect to any "Superior Proposal" made to the Company. Section 5.02(d) of the Merger Agreement states, in relevant part:

> Notwithstanding the foregoing or any other provision of this Agreement to the contrary, prior to obtaining the Company Shareholder Approval, but not after, the Board of Directors of the Company or any committee thereof may (I) make an Adverse Recommendation Change or (II) cause the Company to enter into a Company Acquisition Agreement with respect to a Takeover Proposal not solicited in violation of this Section 5.02 and terminate this Agreement pursuant to Section 7.01(d)(ii), in either case if the Board of Directors of the Company or any committee thereof has determined in good faith, after consultation with its financial advisors and outside legal counsel, that (x) in the case of clause (I), failure to take such action is reasonably likely to be inconsistent with the Board of Directors' fiduciary duties under applicable Law and (y) in the case of clause (II), such Takeover Proposal constitutes a Superior Proposal and the failure to take such action is reasonably likely to be inconsistent with the Board of Directors' fiduciary duties under applicable Law; provided, however, that the Board of Directors of the Company or any committee thereof shall not, and shall cause the Company not to, take any action set forth in clause (I) or clause (II), unless (1) the Company has given Parent at least five business days' prior written notice of its intention to take such action (which notice shall specify the reasons therefor and, if relating to a Takeover Proposal, include an unredacted copy of any such Superior Proposal and an unredacted copy of any relevant proposed transaction agreements, the identity of the party making such Superior Proposal and the material terms thereof), (2) the Company has negotiated, and has caused its Representatives to negotiate, in good faith with Parent during such notice period, to the extent Parent wishes to negotiate, to enable Parent to propose in writing a binding offer to effect revisions to the terms of this Agreement such that it would cause such Superior Proposal to no longer constitute a Superior Proposal (or, if the action set forth in clause (I) does not relate to a Takeover Proposal, such that the failure to effect an Adverse Recommendation Change would not be reasonably likely to be inconsistent with the Board of Directors' fiduciary duties under applicable Law), (3) following the end of such notice period, the Board of Directors of the Company or any committee thereof shall have considered in good faith such binding offer, and shall have determined that the Superior Proposal would continue to constitute a Superior Proposal (or, if the action set forth in clause (I) does not relate to a Takeover Proposal, that the failure to effect an Adverse Recommendation Change would continue to be reasonably likely to be inconsistent with the Board of Directors' fiduciary duties under applicable Law) if the revisions proposed in such binding offer were to be

9

given effect (it being understood that in the event of any change to the financial terms or any other material terms of any such Superior Proposal (or, if the action set forth in clause (I) does not relate to a Takeover Proposal, any material change to the underlying relevant facts and circumstances), this proviso shall again apply (but the five business day period shall instead be two business days); and provided further that any purported termination of this Agreement pursuant to this sentence shall be void and of no force and effect unless the termination is in accordance with Section 7.01 and the Company pays or causes to be paid to Parent the applicable Company Termination Fee in accordance with Section 7.03 prior to or concurrently with such termination.

43. Further locking up control of the Company in favor of Fresenius, the Merger Agreement provides for a "termination fee" of $129 million, payable by the Company to Fresenius if the Individual Defendants cause the Company to terminate the Merger Agreement.

44. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

45. Additionally, Parent entered into voting agreements with Individual Defendant Kapoor, certain of his affiliates, and executive officers Joseph Bonaccorsi and Bruce Kutinsky, pursuant to which they have agreed to vote their Company shares in favor of the Proposed Transaction. Accordingly, such shares are already locked up in favor of the merger.

46. The consideration to be paid to plaintiff and the Class in the Proposed Transaction is inadequate.

47. Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

48. The merger consideration also fails to adequately compensate the Company's stockholders for the significant synergies that will result from the merger.

49. The analyses performed by the Company's own financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan"), confirm the inadequacy of the merger consideration. For

example, J.P. Morgan's *Selected Transactions Analysis* yielded implied trading values for the Company's common stock as high as $65.50.

50. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

*The Proxy Statement Omits Material Information, Rendering It False and Misleading*

51. Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

52. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

53. First, the Proxy Statement omits material information regarding the Company's financial projections and the analyses performed by the Company's financial advisor, J.P. Morgan, in support of its so-called fairness opinion.

54. With respect to Akorn's financial projections, the Proxy Statement fails to disclose: (i) stock-based compensation expense; (ii) projected taxes; (iii) capital expenditures; (iv) changes in net working capital; (v) net income; (vi) net interest expense; (vii) income tax expense; (viii) depreciation; (ix) amortization; (x) a reconciliation of all non-GAAP to GAAP metrics; (xi) the line items contained in the "November 2016 Management Case"; and (xii) the "March 2017 Management Case Extrapolations."

55. With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the range of terminal values for the Company; (ii) J.P. Morgan's basis for applying terminal value growth rates ranging from 0.0% to 2.0%; (iii) the inputs underlying the discount rates ranging from 8.0% to 10.0%; and (iv) the Company's projected net debt as of April

11

21, 2017.

56. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

57. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Recommendation of the Board"; (iii) "Reasons for the Merger"; (iv) "Opinion of the Company's Financial Advisor"; and (v) "Financial Forecasts."

58. Second, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

59. Specifically, the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Akorn's officers and directors, including who participated in all such communications.

60. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

61. Additionally, the Proxy Statement states that, on March 30, 2017, Individual Defendants Kapoor and Rai met with Fresenius management and Fresenius's Chairman, and Fresenius's Chairman requested that Kapoor "agree to invest 20% of any proceeds that Dr. Kapoor would receive in respect of his Company common shares from a transaction with Fresenius Kabi in ordinary shares of Fresenius Parent." However, the Proxy Statement fails to disclose the timing and nature of discussions regarding Kapoor's opportunity to invest in Fresenius, whether an agreement was ultimately reached, and the terms of such agreement.

62. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Recommendation of the Board"; (iii) "Reasons for the Merger"; and (iv) "Interests of the Company's Directors and Executive Officers in the Merger."

63. Third, the Proxy Statement omits material information regarding potential conflicts of interest of J.P. Morgan.

64. For example, the Proxy Statement fails to disclose whether the $47 million additional "Services Fee" Akorn will pay to J.P. Morgan is contingent (in whole or in part) upon consummation of the Proposed Transaction.

65. The Proxy Statement also fails to disclose all services provided by J.P. Morgan to the Company, Fresenius, and their affiliates in the past two years, as well as the amount of compensation received for such services.

66. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

67. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Recommendation of the Board"; (iii) "Reasons for the Merger"; and (iv) "Opinion of the Company's Financial Advisor."

68. Fourth, the Proxy Statement omits material information regarding the background of the Proposed Transaction. The Company's stockholders are entitled to an accurate description of the process the directors used in coming to their decision to support the Proposed Transaction.

69. For example, the Proxy Statement fails to disclose whether any potential bidders other than Fresenius entered into a "clean team confidentiality agreement" with Akorn, and Akorn's basis for entering into such agreement with Fresenius.

70. The Proxy Statement further fails to disclose Individual Defendant Rai's basis for informing Fresenius on February 4, 2017 that Akorn "was willing to proceed with negotiations with Fresenius" only if Fresenius removed the significant contingent value right component from the proposed merger consideration.

71. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Recommendation of the Board"; and (iii) "Reasons for the Merger."

72. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Akorn's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Akorn**

73. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

14

74. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Akorn is liable as the issuer of these statements.

75. The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

76. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

77. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

78. The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

79. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

80. Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Fresenius

81. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

82. The Individual Defendants and Fresenius acted as controlling persons of Akorn within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Akorn and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

83. Each of the Individual Defendants and Fresenius was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

84. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Proxy Statement.

85. Fresenius also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

86. By virtue of the foregoing, the Individual Defendants and Fresenius violated Section 20(a) of the 1934 Act.

87. As set forth above, the Individual Defendants and Fresenius had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: June 2, 2017                  **O'BELL LAW FIRM, LLC**

By: */s/ Eric J. O'Bell*

**OF COUNSEL:**           Eric J. O'Bell (#26693)
3500 North Hullen Street

**RIGRODSKY & LONG, P.A.**    Metairie, LA 70002
Brian D. Long                    (504) 456-8677
Gina M. Serra                    (504) 456-8653 facsimile
2 Righter Parkway, Suite 120    ejo@OBellLawFirm.com
Wilmington, DE 19803         *Attorneys for Plaintiff*
(302) 295-5310

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
(484) 324-6800