# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ROBERT BERG, On Behalf of Himself and All Others Similarly Situated, | Case No. 1:17-cv-05016 |
| Plaintiff, | |
| | Consolidated with:[1] |
| v. | 1:17-cv-05017 |
| | 1:17-cv-05018 |
| AKORN, INC., JOHN N. KAPOOR, | 1:17-cv-05021 |
| KENNETH S. ABRAMOWITZ, ADRIENNE L. | 1:17-cv-05022 |
| GRAVES, RONALD M. JOHNSON, STEVEN J. | 1:17-cv-05026 |
| MEYER, TERRY A. RAPPUHN, BRIAN | |
| TAMBI, ALAN WEINSTEIN, RAJ RAI, | <u>CLASS ACTION</u> |
| FRESENIUS KABI AG, and QUERCUS | |
| ACQUISITION, INC., | Hon. Thomas M. Durkin |
| Defendants. | |
| THEODORE H. FRANK, | |
| Intervenor. | |

---

## [SECOND AMENDED PROPOSED] COMPLAINT
## OF INTERVENOR THEODORE H. FRANK

---

Intervenor Theodore H. Frank, by and through his attorneys, intervenes for the purpose of asking this Court to provide an accounting of payments made to Robert Carlyle, Robert Berg, Jorge Alcarez, Shaun House, Sean Harris, and Demetrios Pullos (collectively, "Plaintiffs") and their settling counsel, from Akorn, Inc. ("Akorn") and/or any other defendants named in Plaintiffs' actions (collectively, "Defendants"); and to exercise its inherent authority or equitable powers to require disgorgement of any unjust enrichment achieved by Plaintiffs in this action; and to enjoin Plaintiffs and certain of their counsel from profiting off of the breach of their fiduciary duty to Frank in similar

---

[1] Proposed Intervenor intends to seek consolidation to the extent intervention is permitted.

sham litigation elsewhere; and to preserve his appellate rights in this proceeding. Intervenor Frank alleges as follows:

## NATURE OF THE ACTION

1.     The Seventh Circuit has drawn a line against shareholder merger "strike suits" that benefit only attorneys. A "class action that yields fees for class counsel and nothing for the class—is no better than a racket. It must end." *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718, 724 (7th Cir. 2016) ("*Walgreen*"). The six Plaintiffs here filed precisely such a putative class action, and each of them and/or certain counsel secured payment for their "racket" though a dubious procedural end run to avoid *Walgreen* and any substantive judicial review.

2.     Upon information and belief, the counsel who stand to benefit from the inappropriate attorneys' fees include Brian D. Long and Gina M. Serra of Rigrodsky & Long, P.A.; Richard Maniskas of RM Law, P.C.; Christopher J. Kupka, Donald J. Enright, and Elizabeth K. Tripodi of Levi & Korsinsky, LLP; Juan E. Monteverde of Monteverde & Associates PC; James M. Wilson, Jr. and Nadeem Faruqi of Faruqi & Faruqi, LLP; Daniel Kuznicki of Brower Pivin P.C.; and Lewis Kahn of Kahn Swick & Foti, LLC ("Settling Counsel").

3.     By virtue of filing claims on behalf of a class of shareholders, the Plaintiffs and Settling Counsel undertook fiduciary duty to shareholders. Among these duties is the duty of loyalty, which generally prohibits fiduciaries from profiting through self-dealing. Frank seeks to recover money Plaintiffs and Settling Counsel, which have unjustly misappropriated fees through the violation of their fiduciary duties, and to enjoin Plaintiffs and Settling Counsel from engaging in similar sham litigation elsewhere—at least concerning corporations where Frank is shareholder.

4.     Traditionally, merger strike suits were brought to extort attorneys' fees through the leverage of a time-sensitive motion for preliminary injunction, which could potentially derail a billion-dollar merger like the underlying transaction here. Until recently, strike suits were generally settled through a executing memorandum of understanding, which would ultimately result in a formal class action settlement agreement and fairness hearing, which allowed class member shareholders to object

to the payment of attorneys' fees. For example, a shareholder represented by Mr. Frank and the Competitive Enterprise Institute's Center for Class Action Fairness successfully objected to the settlement in *Walgreen* this way.

5.     However, over the last year, plaintiffs' attorneys have increasingly eschewed formal class action settlement and have turned to "mootness fees" to evade careful judicial review required under *Walgreen* and *In re Trulia, Inc. Stockholder Litigation*, 129 A.3d 884, 894 (Del. Ch. 2016). *See* Rickey, Anthony, *Absent Reform, Little Relieve in Sight From Chronic "Merger Tax" Class-Action Litigation*, Legal Backgrounder, Washington Legal Foundation (Aug. 25, 2017), available online at: http://www.wlf.org/upload/legalstudies/legalbackgrounder/082517LB_Rickey.pdf;   Matthew D. Cain, Jill Fisch, Steven Davidoff Solomon, and Randall S. Thomas, *The Shifting Tides of Merger Litigation* ("*Shifting Tides*"), ECGI Working Paper No. 375/2017 (Nov. 2017), Available online at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2922121.

6.     This case is typical of the new "mootness fee" racket—Plaintiffs agreed to dismiss their complaints because a worthless supplemental disclosure by the corporation has supposedly rendered the complaints moot. The Plaintiffs represented that they have not agreed on any attorney fee award and they moved for each court to retain jurisdiction to award fees if the parties cannot agree to them. (Never mind that mootness fees have no basis in federal procedure or in the Exchange Act, but are instead awarded by Delaware courts as an exception to the American Rule. *See*, *e.g.*, *Trulia*, 129 A.3d at 898.)

7.     While such resolution does not bind absent class members, it strongly suggests that the underlying litigation constitutes simple rent-seeking. As commentators have recently observed:

> Although these cases are being dismissed without a release, reflecting the likelihood that they are largely nuisance suits, they appear to be generating the payment of mootness settlement fees, creating an incentive for plaintiffs' lawyers to continue to file them. These cases appear to indicate that plaintiffs' counsel may be extracting rents by seeking low cost payments to "go away". Mootness fee payments thus likely warrant a more thoughtful response by the federal courts.

*Shifting Tides*, *supra* at 35-36.

8. Based on disclosed Federal mootness fee awards, plaintiffs' attorneys typically receive hundreds of thousands of dollars per case in mootness fees, as they did in this case. This is nearly as much as they got in the old racket (*cf. Walgreen*, 832 F.3d at 721 ($370,000)), but for much less work and without any judicial scrutiny.

9. Without intervention, Plaintiffs and Settling Counsel will be undeterred from the racket of filing sham litigation for the purpose of extracting fees in violation of their fiduciary duties. Without intervention, *Walgreen's* directive to end the racket would be unfulfilled.

## JURISDICTION AND VENUE

10. The six Plaintiffs each alleged a cause of action under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and regulations promulgated thereunder. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and also 28 U.S.C. § 1331.

11. Additionally, or in the alternative, this Court has supplemental jurisdiction under 28 U.S.C. § 1367. Frank asserts sanctions and unjust enrichment claims against all Plaintiffs and Settling Counsel for their breach of fiduciary duty to the class, and these claims are so related to the underlying suits that they form part of the same case or controversy under Article III of the United States Constitution.

12. This Court has personal jurisdiction over each of the Plaintiffs, because they actively do and/or have done business in Illinois (including appearing in this matter and/or directing correspondence into this District pertaining to this litigation). Personal jurisdiction over Plaintiffs is proper because they have transacted business within Illinois, thereby subjecting Plaintiffs to personal jurisdiction under the Illinois Long-Arm Statute. 735 ILCS 5/2-209(c).

13. Venue in this district is proper under 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events or omissions giving rise to the claim occurred within this district. Venue is also proper under 18 U.S.C. § 1965(a) to the extent that the Plaintiffs and Defendants transact substantial business in this District.

14.     Frank is, and has been since June 20, 2017, a shareholder of Akorn common stock. He currently owns 1000 shares of Akorn stock.

15.     Frank founded the Center for Class Action Fairness in 2009. The Center was a non-profit public-interest law firm that became part of the non-profit Competitive Enterprise Institute in 2015. The Center brings good-faith objections to abusive class-action settlements, and has won dozens of objections and over a hundred million dollars for consumer and shareholder class members. They have won national acclaim for their work, with favorable coverage in, among other publications, the *New York Times* and *Wall Street Journal*, and have been praised by courts, including the Seventh Circuit, for their work. *See Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) ("Theodore Frank and the other objectors flagged fatal weaknesses in the proposed settlement. . . . a selfish deal between class counsel and the defendant").

16.     Nominal Defendant Akorn, Inc. is a Louisiana corporation, with its principal place of business at 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

17.     Nominal Defendants John N. Kapoor, Ronald M. Johnson, Steven J. Meyer, Brian Tambi, Alan Weinstein, Kenneth S. Abramowitz, Adrienne L. Graves, and Terry A. Rappuhn are each current or former directors of Akorn.

18.     Plaintiff Robert Carlyle purported to be a shareholder of Akorn. Carlyle subjected himself to the jurisdiction of this Court by filing his first complaint in this district. No. 17-cv-04455, Dkt. 1. Carlyle and his attorneys also subjected themselves to the jurisdiction by appearing after his second complaint, filed in the Middle District of Louisiana, was transferred to this district, and by requesting that the district court retain jurisdiction over fees. *See* No. 17-cv-05022, Dkts. 23-24.

19.     Plaintiff Robert Berg purported to be a shareholder of Akorn. Berg and his attorneys subjected themselves to the jurisdiction of this Court by appearing after his complaint, filed in the Middle District of Louisiana, was transferred to this district, and by requesting that the district court retain jurisdiction over fees. *See* No. 17-cv-05016, Dkts. 53-54.

20.     Plaintiff Jorge Alcarez purported to be a shareholder of Akorn. Alcarez and his attorneys subjected themselves to the jurisdiction of this Court by appearing after his complaint, filed in the Middle District of Louisiana, was transferred to this district, and by requesting that the district court retain jurisdiction over fees. *See* No. 17-cv-05017, Dkts. 33-34.

21.     Plaintiff Shaun A. House purported to be a shareholder of Akorn. House and his attorneys subjected themselves to the jurisdiction of this Court by appearing after his complaint, filed in the Middle District of Louisiana, was transferred to this district, and by requesting that the district court retain jurisdiction over fees. *See* No. 17-cv-05018, Dkts. 32-33.

22.     Plaintiff Sean Harris purported to be a shareholder of Akorn. Harris and his attorneys subjected themselves to the jurisdiction of this Court by appearing after his complaint, filed in the Middle District of Louisiana, was transferred to this district, and by requesting that the district court retain jurisdiction over fees. *See* No. 17-cv-05021, Dkts. 32-33.

23.     Plaintiff Demetrios Pullos purported to be a shareholder of Akorn. Pullos and his attorneys subjected themselves to the jurisdiction of this Court by appearing after his complaint, filed in the Middle District of Louisiana, was transferred to this district, and by requesting that the district court retain jurisdiction over fees. *See* No. 17-cv-05026, Dkts. 17-18.

24.     Intervenor Frank is entitled to intervene in this action as a matter of right pursuant to Rule 24(a) because "he claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect [his] interest." Specifically, Intervenor has an interest in payments made by Defendants for resolution of the underlying claims. Such payments were made in breach of Settling Counsel's fiduciary duty to class members like frank and ought to remain with Akorn. Failure to grant intervention practically forfeits Frank's interest.

25.     Existing parties do not adequately represent Frank's interests. The Defendants are bound by any agreements they struck with Plaintiffs. No existing party has any interest in pursuing Plaintiffs and Settling Counsel for their unjust enrichment—certainly not the Plaintiffs themselves.

26.     On April 24, 2017, Akorn and Fresenius Kabi AG ("Fresenius") announced that they had entered into an agreement for Akorn to be acquired by the German pharmaceutical company. When the transaction closes (which is expected in early 2018), shareholders of Akorn will be paid $34/share, amounting to $4.3 billion, and Fresenius will also assume about $450 million in debt. On May 22, Akorn issued a preliminary definitive proxy statement recommending that shareholders approve the merger, and the definitive proxy statement was issued on June 15.

## I.     Redundant Strike Suits Filed by Plaintiffs

27.     From June 2 to June 22, 2017, six plaintiffs filed seven suits alleging that these proxy statements were deficient and violated Sections 14(a) and 20(a) of the Exchange Act of 1934 ("Exchange Act"). Upon information and belief, the Plaintiffs, in conjunction with Settling Counsel, each filed "strike suit" complaints to secure attorneys' fees in exchange for worthless disclosures of no value to shareholders or anyone else.

28.     On June 2, 2017, Robert Berg filed his complaint in the Middle District of Louisiana (currently at No. 17-cv-5016 (Durkin, J.)). The complaint lists as defendants: (1) Akorn; (2) John N. Kapoor, Ronald M. Johnson, Steven J. Meyer, Brian Tambi, Alan Weinstein, Kenneth S. Abramowitz, Adrienne L. Graves, and Terry A. Rappuhn (collectively, the "Director Defendants"); (3) Akorn CEO Raj Rai; and (4) Fresenius Kabi AG and Quercus Acquisition, Inc. The Berg complaint was signed by attorneys Brian D. Long of Rigrodsky & Long, P.A. and Richard A. Maniskas of RM Law, with the assistance of local counsel.

29.     On June 7, 2017, Jorge Alcarez filed his complaint in the Middle District of Louisiana (currently at No. 1:17-cv-05017). The complaint lists as defendants Akorn and the Director Defendants. The Alcarez complaint was signed by attorney Donald Enright and Elizabeth Tripodi of Levi & Korsinsky LLP, with the assistance of local counsel.

30.     On June 12, 2017, Shaun House filed his complaint in the Middle District of Louisiana (currently at No. 1:17-cv-05018). The complaint lists as defendants Akorn and the Director

Defendants. The House complaint was signed by attorney Juan E. Monteverde of Monteverde & Associates PC, with Lewis Kahn of Kahn Swick & Foti, LLC serving as local counsel.

31.     On June 13, 2017, Robert Carlyle filed his first complaint in this district (No. 1:17-cv-04455). The complaint lists as defendants Akorn and the Director Defendants. The first Carlyle complaint was filed by attorney Daniel Kuznicki of Brower Piven P.C., with the assistance of local counsel which no longer represents Carlyle. However, Carlyle voluntarily dismissed this complaint on June 20 so he could refile in the Middle District of Louisiana—several days *after* Akorn filed a motion to change venue from the Middle District of Louisiana to this district. On the same day as Robert Carlyle dismissed his original complaint, on June 20, 2017 Carlyle filed his second complaint in the Middle District of Louisiana (currently at No. 1:17-cv-05022). The complaint lists as defendants Akorn and the Director Defendants. The second Carlyle complaint was signed by attorney Daniel Kuznicki of Brower Piven P.C., with Lewis Kahn of Kahn Swick & Foti, LLC serving as local counsel.

32.     On June 14, 2017, Sean Harris filed his complaint in the Middle District of Louisiana (currently No. 1:17-cv-05021). The complaint lists as defendants Akorn and the Director Defendants. The Harris complaint was signed by attorney James M. Wilson of Faruqi & Faruqi, LLP with Lewis Kahn of Kahn Swick & Foti, LLC serving as local counsel.

33.     On June 22, 2017, Demetrios Pullos filed his complaint in the Middle District of Louisiana (currently No. 1:17-cv-05026). The complaint lists as defendants Akorn and the Director Defendants. The Pullos complaint was signed by attorney Lewis Kahn of Kahn Swick & Foti, LLC.

34.     All complaints by all six Plaintiffs are similar. Subsequent complaints appear to have plagiarized earlier ones. For example, paragraph 55 of the (earliest) Berg complaint alleging that the proxy statement is defective for failing to disclose *inter alia* "J.P. Morgan's basis for applying terminal value growth rates ranging from 0.0% to 2.0%" is *verbatim* with paragraph 53 of the (second-filed) Alcarez complaint, and almost identical to paragraphs in four of the subsequent complaints. There are several other similar instances of copying.

35.     Each and every Plaintiff pleaded two counts—Count I covering Section 14(a) and Count II covering Section 20(a) of the Exchange Act. The text of Count II in all seven complaints is

substantially identical. The Plaintiffs' complaints all allege that purported omissions in the proxy statements render them "false and misleading" under the Exchange Act. Each Plaintiff identifies a somewhat different list of purported material omissions. None of the omissions pleaded by Plaintiffs are plainly material.

36. On June 15, 2017, Akorn filed an "Expedited Motion for Change of Venue Pursuant to 28 U.S.C. § 1404(a)" to this district because Akorn headquarters and Fresenius' American headquarters are both within this district and Akorn maintains no offices or facilities in Louisiana. The Plaintiffs did not respond to the motion for over two weeks, and only after the court ordered them to respond by June 30. Meanwhile, on June 29, parties in all six pending actions filed a stipulation to consolidate the matters "for all purposes." On June 30, the Court granted the motion, but only consolidated them "for the limited purpose of resolving the issue of venue." On July 5, Akorn replied in favor of their motion the change venue, and on the same date, the district court granted the motion.

37. Cases received by the Northern District of Illinois were all assigned to different judges, such that—including the original Carlyle complaint—seven different judges were assigned in the seven related matters. Neither Defendants nor Plaintiffs alerted the court to this inefficiency.

## II. Plaintiffs and Settling Counsel Owed a Fiduciary Duty to Class Members

38. By virtue of filing claims on behalf of a class of shareholders, the Plaintiffs and Settling Counsel undertook fiduciary responsibility to those class members. The fiduciary duty attaches from the moment the complaint is filed on behalf of the putative class and it is not contingent on class certification, settlement, or Rule 23(e). Representatives and class counsel may breach their fiduciary duties even if they do not release the claims of absent class members.

39. The foremost fiduciary duty is the duty of loyalty. The duty of loyalty requires attorneys and class representatives to serve the beneficiaries (absent class members) first and foremost, or in other words, to act in their clients' best interests. In the context of a class action, the ability of fiduciaries to receive compensation without benefiting the class presents the possibility that the advisor could be enriched at the expense of the class.

40.     Class members, like other beneficiaries, have an equitable cause of action against fiduciaries who self-deal. Self-dealing by fiduciaries can be remedied by disgorgement even if class members were not directly harmed by the self-dealing. Otherwise, fiduciary duties could not be enforced for indirect claimants such as shareholders.

### III.     Supplemental Disclosure and Dismissal of Suits Due to "Mootness"

41.     On July 10, 2017, Akorn filed a Form 8-K with the SEC, which contained supplemental disclosures to the June 15 proxy statement. A copy of the supplemental disclosure is attached as **Exhibit 1** ("Supplemental Disclosure"); the definitive proxy that the supplement amends is attached as **Exhibit 2** ("Proxy Statement").

42.     Akorn prefaced the disclosures by denying that they were material:

> Akorn believes that the claims asserted in the Federal Merger Litigation are without merit and no supplemental disclosure is required under applicable law. However, in order to avoid the risk of the Federal Merger Litigation delaying or adversely affecting the merger and to minimize the costs, risks and uncertainties inherent in litigation, and without admitting any liability or wrongdoing, Akorn has determined to voluntarily supplement the proxy statement as described in this Current Report on Form 8-K.  Nothing in this Current Report on Form 8-K shall be deemed an admission of the legal necessity or materiality under applicable laws of any of the disclosures set forth herein.  To the contrary, Akorn specifically denies all allegations in the Federal Merger Litigation that any additional disclosure was or is required.

Supplemental Disclosure, Ex. 1 at 2.

43.     All six Plaintiffs implausibly claimed the supplemental disclosures rendered their pending complaints moot. In fact, the supplemental disclosures failed to cure numerous deficiencies Plaintiffs had pleaded, and none of the supplemental disclosures were material. Thus, none of the disclosures would justify mootness fees even if the complaints had been filed before the Delaware Chancery—let alone under Federal procedure, which provide no such fees. *See United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997) (to receive fees, complaint must have been "meritorious when filed").

44.     Three sets of purported disclosures are added by the supplement. First, the Supplemental Disclosures describe non-specific offers Fresenius made to Akorn's chairman, Dr. John

Kapoor, which Akorn did not accept. Second, the supplement says that Akorn's board considered the effect of the merger on previously-disclosed (and unrelated) shareholder litigation. Third, the supplement includes a caveat-laden GAAP reconciliation of previously-disclosed financial projections.

45.     None of these disclosures are material, let alone plainly material.

### A.     The timing of offers received by a director and *not accepted* cannot be material.

46.     The Supplemental Disclosures delete the last sentence in the second full paragraph of page 34, which stated: "There were **no other substantive discussions** with respect to such an investment by Dr. Kapoor and no agreement with respect to such an investment was ever entered into." Ex. 2 at 34 (emphasis added). The proxy statement had disclosed that on March 31 Fresenius had proposed that "Dr. Kapoor enter into a voting agreement to commit to vote his Company common shares in favor of a transaction with Fresenius Kabi and that Dr. Kapoor agree to invest 20% of any proceeds." *Id.* The supplemental disclosures add that a second offer involving Dr. Kapoor's investment was made on April 2 as part of a two-option proposal that was never accepted. Ex. 1 at 3. The new paragraph concerning proposals received by Dr. Kapoor concludes with a slightly revised version of the above statement deleted from the proxy: "After April 2, 2017, there were no further discussions of any investment by Dr. Kapoor in Fresenius Parent (including the investments suggested . . . on March 30, 2017 and April 2, 2017, or any other potential investment), and no agreement with respect to any such investment was ever entered into and no investment was ever made." *Id.* The supplemental disclosure then simply repeats the April 2 proposals twice, stating that Dr. Kapoor and CEO Rai conveyed Fresenius' proposals to the board and that the board discussed them. *Id.* at 4.

47.     Dr. Kapoor is chairman of the Akorn's board and a significant shareholder, and the Proxy Statement previously reported that Fresenius suggested he "enter into a voting agreement to commit to vote his Company common shares in favor of a transaction with Fresenius Kabi and that Dr. Kapoor agree to invest 20% of any proceeds." Proxy Statement, Ex. 2 at 34.

48.     Two Plaintiffs alleged that the Proxy Statement was false and misleading because it did not "disclose the timing and nature of discussions regarding Kapoor's opportunity to invest in Fresenius, whether an agreement was ultimately reached, and the terms of such agreement." No. 17-cv-5016, Dkt. 1 ¶ 61; *accord* No. 17-cv-5017, Dkt. 1 ¶ 61. These two Plaintiffs filed their complaints before the June 15, 2017 Proxy Statement, which explicitly says "There were no other substantive discussions with respect to such an investment by Dr. Kapoor and no agreement with respect to such an investment was ever entered into." Proxy Statement at 34. Plaintiffs pleaded no plausible facts supporting their factually false legal conclusion that the Proxy Statement (or even the preliminary statement) was "false and misleading." No. 17-cv-5016, Dkt. 1 ¶ 62. The Proxy Statement (and preliminary statement) did not discuss the terms of Dr. Kapoor's investment agreement simply because *no such agreement existed*.

49.     The Supplemental Disclosures elaborate on the non-substantive discussions, which by definition could not have been material. In particular, the Supplemental Disclosures report that a second offer involving Dr. Kapoor's investment was made on April 2 as part of a two-option proposal ***that was never accepted***. Ex. 1 at 3. These disclosures are cumulative and highlight that the Proxy Statement accurately reported no other "substantive" discussion concerning Dr. Kapoor's investment occurred—in fact, the supplemental prose says the board discussed the "lack of specificity of the investment proposal." *Id.* In any event, these undetailed and unaccepted offers from Fresenius have no material bearing on the offer Akorn shareholders were actually presented.

**B.      Whether the board took pending litigation into account is obvious to any reasonable investor, and explicit disclosure of such consideration is not material.**

50.     The second supplemental disclosure lists an additional consideration that the board evaluated for the proposed merger, which is added to the end of a series of 47 bullet point considerations from the definitive proxy. *See* Ex. 2 at 36-40. The new material says:

> The Board also was aware of and considered the likely effect of the potential merger with Fresenius Kabi on the previously disclosed derivative lawsuits in which putative shareholders seek to litigate on behalf of the Company claims for alleged breaches of fiduciary duty by certain directors and officers or

> former officers of the Company, to which claims the Board assigned no value based on the conclusions and recommendations of the special committee of the Board that had conducted an inquiry into related shareholder demand allegations.

Supplemental Disclosures, Ex. 1 at 4.

51.     Apart from being extraordinarily vague (which derivative lawsuits? what likely effects?), this supplemental material is cumulative. The proxy statement already disclosed that the board considered "the risk of litigation in connection with the execution of the merger agreement and the completion of the merger." Ex. 2 at 40. A reasonable investor would know that the board would be aware of the disclosed lawsuits naming board members as defendants, and would consider the likely effects of merger on pending lawsuits—as the definitive proxy already disclosed.

52.     Plaintiff Pullos had pleaded that the Proxy Statement "fails to disclose whether these [securities] lawsuits were discussed by the Board and whether the Board took them into account when deciding to undertake the sales process and enter into the Merger Agreement." No. 17-cv-5026, Dkt. 1 ¶ 47.

53.     In fact, the litigation Plaintiff Pullos refers to had been disclosed for years, regularly updated in Akorn's quarterly and annual reports. For example, this disclosure was provided prior to any Plaintiffs filing their complaints (Akorn, Inc. Form 10-Q, May 4, 2017 at 54):[2]

> As previously disclosed in various reports filed with the SEC, on March 4, 2015, a purported class action complaint was filed entitled *Yeung v. Akorn, Inc., et al.*, in the federal district court of Northern District of Illinois, No. 15-cv-1944. The complaint alleged that the Company and three of its officers violated the federal securities laws in connection with matters related to its accounting and financial reporting in the wake of its acquisitions of Hi-Tech Pharmaceutical Co., Inc. and VersaPharm, Inc. . . . On August 9, 2016, the defendants filed a motion to dismiss the case. On March 6, 2017, the court denied the motion to dismiss and the defendants subsequently filed an answer to the consolidated

54.     The disclosure Plaintiff Pullos sought—and was provided in the Supplemental Disclosures—is simply obvious. *Of course* board members would consider the effect a merger might

---

[2] Incorporated into this complaint by reference, available online at:
https://www.sec.gov/Archives/edgar/data/3116/000162828017004840/akorn10q-03312017.htm

have on pending litigation, doubly so because some board members are named defendants in the referenced pending litigation.

55.     No reasonable investor would derive any value from the unremarkable fact that the Board considered pending litigation in reaching its decision. *Cf. Walgreen*, 832 F.3d at 722 ("There was no suggestion that the suit . . . could have had a significant impact on the formation or operation of Walgreens Boots Alliance, or that it was even related to the formation of the new company.").

        **C.     Use of EBITDA financial projections could not have rendered the Proxy Statement misleading, and their reconciliation was not material.**

56.     Finally, the supplemental disclosures add a reconciliation of GAAP net income from the previously-provided non-GAAP revenue projections of the November 2016 Management Case and March 2017 Management Case provided in the definitive proxy. *See* Ex. 2 at 47-48. The supplemental prose admits that the provided numbers are out of date. Ex. 1 at 5 ("Some or all of the estimates and assumptions underlying the amounts provided in the reconciliations below have changed since the date the applicable Financial Forecasts were prepared, such changes are not reflected in the reconciliations provided below and actual results will differ from such amounts."). It also admits that some values are simply assumed to be $0 due to missing data, and cautions that the reconciliation is "not indicative of the Company's expected performance." *Id.* Instead the reconciliations are "being included solely to provide a quantitative reconciliation of the non-GAAP financial measures included in the Financial Forecasts to the most comparable GAAP financial measures." *Id.* Following several more disclaimers, the Supplemental Disclosure reproduces bullet points essentially unchanged from the Proxy Statement. *Compare* Ex. 1 at 6 *with* Ex. 2 at 49.

57.     As a general rule, projected financial results are not material—especially not interim projections used only in the course of negotiation like the November 2016 Management Case. And simply reconciling previously-disclosed non-GAAP projections is not material either, especially when widely-accepted non-GAAP metrics like EBIDTA were previously provided. *See Assad v. DigitalGlobe, Inc. at al.*, Nos. 17-cv-1097, -1140, -1159, -1190, -1570, 2017 WL 3129700 (D. Colo. Jul. 21, 2017) ("it is clear that some of the non-GAAP financial measures Zand challenges are recognized and specifically

defined such that they have less potential to be misleading") (denying preliminary injunction to five plaintiffs); *Bushansky v. Remy Intl., Inc.*, --- F.Supp.3d ---, 2017 WL 3530108, at *5 (S.D. Ind. Aug. 16, 2017) (finding GAAP reconciliation "not plainly material" and rejecting proposed settlement under *Walgreen*).

58.     The alleged reconciliation issue pleaded by all Plaintiffs arises from Akorn's disclosure of financial forecasts that were prepared by the company to provide an overview of its business and operations, called the November 2016 and March 2017 Management Cases. *See* Proxy Statement, Ex. 2 at 47-48. The projections include gross revenues, and earnings before interest, tax, depreciation and amortization (EBITDA), among other metrics. All Plaintiffs complained about Akorn's purported failure to provide a reconciliation of EBITDA and unlevered free cash flow to GAAP (generally accepted accounting principles) measurements. The absent reconciliation supposedly rendered the Proxy Statement "incomplete and therefore misleading," but this notion is preposterous, as the SEC has recently affirmed.

59.     As a threshold matter, Plaintiffs did not make a "clear showing" that any of the alleged omissions rendered any specific statement in the proxy misleading. Instead, Plaintiffs contended only that the alleged omissions generally rendered the projections misleading. But courts have consistently found such allegations too conclusory to state a Section 14(a) claim. *See, e.g., La. Mun. Police Emps. Ret. Sys. v. Cooper Indus. PLC*, 2012 WL 4958561, at *8 (N.D. Ohio Oct. 16, 2012) ("[P]laintiff must identify a precise 'statement' in a proxy that is either affirmatively misleading or that is rendered misleading by the operation of a materially omitted fact."). Plaintiffs' claims lacked merit for this reason alone.

60.     Moreover, the Proxy Statement makes clear that the Management Cases were prepared for the benefit of the board, and should not be mistaken for the sorts of projections made in periodic reports:

> These Financial Forecasts (as defined below) **were not prepared with a view toward public disclosure** or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial data,

published guidelines of the SEC regarding forward-looking statements or generally accepted accounting principles in the United States ("GAAP").

Proxy Statement, Ex. 2 at 46.

61.    The proxy makes these non-GAAP metrics crystal clear. *See id.* at 46 and 47 ("EBITDA and EBIT are non-GAAP financial measures . . . Unlevered free cash flows is a non-GAAP financial measure and should not be considered as an alternative to net income or operating income as a measure of operating performance or cash flows or as a measure of liquidity.").

62.    "Moreover, a proxy need not include all financial data or projections that would be helpful in making an independent determination of fair value." *Himmel v. Bucyrus Int'l, Inc.*, Nos. 10-1104, -1106, -1179, 2014 WL 1406279, at *15 (E.D. Wis. Apr. 11, 2014) (citing *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1174 (Del. Ch. 2000) and *In re CheckFree Corp. Shareholders Litig.*, 2007 WL 3262188 (Del. Ch. Nov. 1, 2007)) (granting motion to dismiss). In *CheckFree*, the Delaware Chancery found that complete management projections were not material in the first place, so they did not need to be disclosed—even though they were relied upon by financial advisors in creating their fairness opinion. *See CheckFree*, 2007 WL 3262188, at *3; *accord In re Trulia, Inc. Stockholder Litig.*, 129 A.3d 884, 905 n.79 (Del. Ch. 2016) ("A fair summary, however, does not require disclosure of sufficient data to allow stockholders to perform their own valuation."). And *CheckFree* was decided long before the Delaware Chancery introduced a tougher "plainly material" standard, which is now the law of this circuit. *See id.* at 898; *Walgreen*, 832 F.3d at 725 (adopting *Trulia*).

63.    The board of *Akorn* had no obligation to provide as much detail from the Management Cases as they did. The fact that shareholders received (optional) non-GAAP projections does not render the Proxy Statement misleading. After all, Fresenius, the board, and financial advisor J.P. Morgan used the EBIDTA projection precisely because this metric is *widely understood by investors*. As another court has recognized:

> Additionally, it is clear that some of the non-GAAP financial measures Zand challenges are recognized and specifically defined such that they have less potential to be misleading. In particular, the SEC has provided a definition of EBITDA and allows its broader use than other non-GAAP financial measures in recognition that EBITDA is regularly used and well understood. *Non-GAAP Financial Measures*, Sec. Com. Discl. 5620589, Question 103.01,

available at https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm (updated May 17, 2016) (requiring that variances from the SEC's definition of EBITDA be identified and discussing Exchange Act Release No. 47226, which defines and exempts EBITDA from certain requirements of Item 10 of Regulation S-K stating, "[w]e are exempting EBIT and EBITDA from this provision because of their wide and recognized existing use.").

*DigitalGlobe*, 2017 WL 3129700 (D. Colo. Jul. 21, 2017) (denying preliminary injunction among other reasons because plaintiffs not likely to succeed in showing materiality for GAAP reconciliation).[3]

64.     Several of the plaintiffs incorrectly point to SEC Regulation G (17 C.F.R. § 244.100) as supposedly requiring Akorn to reconcile non-GAAP projections. *E.g.* No. 17-cv-5018, Dkt. 1 ¶ 51; No. 17-cv-5021, Dkt. 1 ¶ 46; No. 17-cv-5026, Dkt. 1 ¶ 52.[4] The SEC and district courts have flatly rejected this theory.

65.     Regulation G applies to disclosures under 15 U.S.C. § 7261: "Disclosures in periodic reports." The Proxy Statements are not periodic reports, and the projections are clearly disclaimed as not being prepared for public disclosure—just as information that the board and financial advisors considered in valuing the transaction. Thus, "§ 7261 is inapplicable because the Definitive Proxy is not a periodic report or a public disclosure." *Bushansky v. Remy Intl., Inc.*, No. 15-1343, 2017 WL 3530108, at *5 (S.D. Ind. Aug. 16, 2017) (finding GAAP reconciliation "not plainly material" and rejecting proposed settlement under *Walgreen*). While Regulation G has existed for 14 years, Plaintiffs unsurprisingly do not cite any case in which a Court has found a Section 14(a) violation based on the bog-common use of EBITDA projections.

66.     The SEC recently provided guidance concerning merger-related projections, which confirms that projections without GAAP reconciliation may be provided in merger-related disclosures when "the financial measures are included in forecasts provided to the financial advisor for the purpose of rendering an opinion that is materially related to the business combination transaction."

---

[3] As an illustration of the duplicative nature of these actions, four of the Plaintiffs in the Akorn actions had complaints signed by the same non-local attorneys as four plaintiffs in the *DigitalGlobal* actions.

[4] As an example of the profligate plagiarism among Plaintiffs' counsel, each of these three paragraphs from three different Plaintiffs' complaints comprise 134 words verbatim.

Securities Exchange Commission Discl. 5620589, Question 101.01 (Oct. 17, 2017), available online at: https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm. The non-GAAP financial measures were including in the Proxy Statement for precisely this purpose, so Plaintiffs are simply mistaken in their argument.

## IV.  Plaintiffs Stipulate to Dismissal of Sham Litigation

67.     Following the supplemental disclosures, on July 14, all six Plaintiffs appeared through the same counsel (out-of-district attorney Christopher Kupka of Levi & Korsinsky LLP in apparent violation of LR 83.15(a)), and filed a stipulation of dismissal claiming that "as a result of the filing of the Supplemental Disclosures, the disclosure claims relating to the Proposed Merger asserted in the Complaint in the Action have become moot." The stipulations further claim that Plaintiffs may assert a claim for attorneys' fees due to the "common benefit" allegedly provided, and that each of the 6 judges retains jurisdiction "solely for purposes of any potential further proceedings related to the adjudication of any claim . . . for attorneys' fees and/or expenses."

68.     In fact, the six Plaintiffs' dismissals prove the complaints to be a sham—not one complaint was rendered moot by the supplemental disclosures. While every plaintiff alleged that, for example, the lack of GAAP reconciliation rendered the definitive proxy "material misleading," many other claims were not addressed by the supplemental disclosures whatsoever. *Cf. Greisz v. Household Bank, N.A.,* 176 F.3d 1012, 1015 (7th Cir. 1999) ("obviously the rejection of an offer of less than the complete relief sought by a suit does not prove that there is no dispute between the litigants.").

69.     All of the Plaintiffs except Harris pleaded that the growth and discount rates used in J.P. Morgan's Discounted Cash Flow Analysis were unexplained. Each complaint pleaded that these alleged omissions were material. The supplemental disclosures did not address these alleged omissions.

70.     Likewise, all of the Plaintiffs except Harris pleaded that failing to disclose the amount of compensation advisor J.P. Morgan received from Fresenius was material. This number is not disclosed by the supplement.

71. Even the Harris complaint, which dwells mostly on the GAAP reconciliation issue, pleaded (along with several other plaintiffs) that it was "incomplete and misleading" to not disclose the projected net debt as of April 21, 2017, which J.P. Morgan used in its analysis. "This information is material to Akorn shareholders, and its omission renders the summary of JPM's Discounted Cash Flow Analysis incomplete and misleading." Harris complaint, ¶ 41. The supplemental disclosures did not reveal this allegedly-material information.

72. On July 19, 2017, the proxy vote of Akorn shareholders occurred with a result of 104,651,745 in favor of merger and 104,914 against, with 229,782 abstaining. In other words, among the votes cast, only 0.09993% opposed the merger—fewer than 1 in 1000. *Cf. Walgreen*, 832 F.3d at 723 ("Walgreens Boots Alliance was approved by 97 percent of the Walgreens shareholders who voted. It is inconceivable that the six disclosures added by the settlement agreement either reduced support for the merger by frightening the shareholders or increased that support by giving the shareholders a sense that now they knew everything.").

## V. Ongoing Sham Litigation by Plaintiffs and Settling Counsel

73. Upon information and belief, the Plaintiffs' complaints were little more than a vehicle for attorneys' fees, and the supplemental disclosures simply an excuse to dismiss the complaints and seek fees. Neither Intervenor Frank nor any shareholder (absent putative class member) received benefit from the Supplemental Disclosures. Settling Counsel breached their fiduciary duty to class member shareholders like Frank by depleting Akorn's treasury without providing any benefit to class members which would justify this indirect cost.

74. Strike suits extract value from the threat of legal expenses. Defending a time-sensitive motion for preliminary injunction consumes vast sums, and Plaintiffs and Settling Counsel know this. Defendants frequently pay strike suit filers simply because the costs of defense are even higher.

### A. Intervenor Frank harmed by sham litigation brought by Plaintiffs and Settling Counsel and their breach of fiduciary duty.

75. Plaintiffs and Settling Counsel have been unjustly enriched by breaching their fiduciary duty to shareholders in the underlying actions.

76.     As a shareholder of Akorn, Frank was harmed by such payments. Frank is harmed even if no dividends to Akorn shareholders issue before their shares are converted to cash, because Plaintiffs have extorted the corporation's funds. The merger will not close until early 2018 and may yet be rejected by government regulators or disrupted by intervening events. Given the political hostility to American companies being acquired by foreign corporations, this cannot be ruled out. For example, in 2014 the intended merger between Irish pharmaceutical company Shire plc and American AbbVie Inc. was cancelled due to new Department of Treasury rules aimed at preventing merged companies from obtaining tax treatment enjoyed by foreign corporations. Additionally, the criminal prosecution of former chairman John Kapoor might tempt Fresenius to back out of the transaction. *See* Lisa Schencker, "Head of Akorn board resigns after charges of bribing docs to prescribe opioids," *Chicago Tribune* (Nov. 2, 2017), available online at: http://www.chicagotribune.com/business/ct-biz-kapoor-resigns-as-akorn-chairman-1102-story.html. Should the acquisition not occur, Akorn and its shareholders, including Frank, will be saddled with sunk costs from the transaction—including all payoffs made to Plaintiffs and Settling Counsel.

77.     Additionally, Frank is harmed by Plaintiffs and Settling Counsel when they file similar sham strike suits concerning other proposed mergers of corporations where Frank is a shareholder. Plaintiff Berg and several Settling Counsel are prolific filers of merger strike suits. On information and belief, Plaintiffs and Settling Counsel have harmed and will continue to harm Frank in suits involving securities where Frank is a shareholder.

78.     For example, including this suit, Plaintiff Berg has brought at least twenty-seven similar strike suits in federal courts within the last several months, which upon information and belief were filed with the objective of appropriating attorneys' fees. Several of these actions have already been dismissed for mootness fees. Each of these dismissals retained jurisdiction to file a fee motion if the parties cannot agree to fees, just as in this action. Berg's certifications in this case fail to disclose these actions as required by 15 U.S.C. § 78u–4(a)(2)(v).

79.     Intervenor Frank was a shareholder of corporations where Plaintiff Berg has filed a similar merger strike suit. In particular, Frank owned shares of Whole Foods Market, Inc. and Panera Bread Co. common stock.

80.     All Settling Counsel filed other strike suits for the purpose, on information and belief, of appropriating attorneys' fees.

81.     Between them, Settling Counsel have filed over two hundred strike suits in federal courts since January 1, 2017. Settling Counsel have filed suits against numerous defendants where Frank is or was a shareholder including: Astoria Financial Corp.; Atwood Oceanics, Inc.; Care Capital Properties, Inc.; CU Bancorp; InvenSense, Inc.; Ixia; KCG Holdings, Inc.; Neustar, Inc.; Panera Bread Co.; Parexel International Corp.; Popeyes Louisiana Kitchen, Inc.; Silver Bay Realty Trust Corp.; Stillwater Mining Co.; Stonegate Mortgage Corp.; VCA, Inc.; WGL Holdings Inc.; and Whole Foods Market, Inc.

82.     Upon information and belief, Settling Counsel will continue filing and settling sham litigation against corporations undergoing merger, and will therefore continue to harm Frank when he is a shareholder in these corporations.

### COUNT I
### UNJUST ENRICHMENT

83.     Intervenor Frank re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

84.     As a result of their sham litigation, Plaintiffs and/or Settling Counsel received, appreciated, and accepted benefits beyond those they are legally entitled and in breach of their fiduciary duty to class members.

85.     It would be unjust to allow Plaintiffs and/or Settling Counsel to retain these benefits at the expense of the Frank and other Akorn shareholders who were owed a duty of loyalty by Plaintiffs and Settling Counsel.

86.     As a result of Plaintiffs' unjust enrichment, Intervenor Frank is entitled to an accounting and disgorgement to Akorn equal to the pecuniary value received by Plaintiffs and/or Settling Counsel from Akorn.

<strong>COUNT II</strong><br><strong>INEQUITABLE CONDUCT</strong>

87.     Intervenor Frank re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

88.     The Court retains jurisdiction over fees, and thus has authority to order sanctions and other equitable remedies pertaining to related misconduct, including Settling Counsel's breach of their fiduciary duty in exacting mootness fees for supplemental disclosures in sham litigation which adds no value to the putative class of shareholders.

89.     Disgorgement is an equitable remedy that takes ill-gotten gains from a wrongdoer so that he does not profit from his misconduct.

90.     As a result of seeking mootness fees for dismissing their cases in response to immaterial supplemental disclosures, the Plaintiffs and/or Settling Counsel have received or stand to receive ill-gotten gains from Nominal Defendants by leveraging the underlying class action complaints, which was purportedly filed on behalf of all class members, including Intervenor Frank.

91.     Disgorgement of any mootness fees would ensure that Plaintiffs and/or Settling Counsel do not profit from their misconduct, while returning value to the shareholders, including Frank.

WHEREFORE, Intervenor Frank requests that the Court, pursuant to the its equitable powers and inherent authority:

A.      Require an accounting of attorneys' fees received by Plaintiffs and/or Settling Counsel in these actions;

B.      Disgorge all money unjustly received by Plaintiffs and/or Settling Counsel in breach of their fiduciary duties to class members, and return the funds to the Akorn;

C.      Enter a permanent injunction prohibiting Settling Counsel from accepting payment for dismissal of class action complaints filed under the Exchange Act without first obtaining court adjudication of their entitlement to any requested fee award;

D.      Award reasonable attorneys' fees for Intervenor's counsel, but only to the extent that Intervenor recovers funds for the shareholders; and

E.      Such other and further relief as the Court deems just and proper.


Dated: December 8, 2017            */s/ M.Frank Bednarz*
                                   M. Frank Bednarz, (ARDC No. 6299073)
                                   COMPETITIVE ENTERPRISE INSTITUTE
                                   CENTER FOR CLASS ACTION FAIRNESS
                                   1145 E. Hyde Park Blvd. Apt. 3A
                                   Chicago, IL 60615
                                   Phone: (801) 706-2690
                                   Email: frank.bednarz@cei.com

                                   *Attorney for Theodore H. Frank*

**CERTIFICATE OF SERVICE**

The undersigned certifies he electronically filed the foregoing [Second Amended Proposed] Complaint of Intervenor Theodore H. Frank via the ECF system for the Northern District of Illinois, thus effecting service on all attorneys registered for electronic filing.

Dated: December 8, 2017

/s/ M. Frank Bednarz