## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| ROBERT BERG, On Behalf of Himself and All Others Similarly Situated,<br><br>     Plaintiff,<br><br>v.<br><br>AKORN, INC., JOHN N. KAPOOR, KENNETH S. ABRAMOWITZ, ADRIENNE L. GRAVES, RONALD M. JOHNSON, STEVEN J. MEYER, TERRY A. RAPPUHN, BRIAN TAMBI, ALAN WEINSTEIN, RAJ RAI, FRESENIUS KABI AG, and QUERCUS ACQUISITION, INC.,<br><br>     Defendants.<br>_____<br><br>THEODORE H. FRANK,<br><br>     Intervenor. | Case No. 1:17-cv-05016<br><br>Related cases:[1]<br>1:17-cv-05017<br>1:17-cv-05018<br>1:17-cv-05021<br><br><u>CLASS ACTION</u><br><br>Hon. Thomas M. Durkin |

---

### THEODORE H. FRANK'S MEMORANDUM IN SUPPORT OF MOTION FOR RELIEF UNDER RULE 60(b) AND FOR THE COURT TO ISSUE AN ORDER TO SHOW CAUSE THAT PLAINTIFFS AND THEIR COUNSEL SHOULD NOT BE SANCTIONED PURSUANT TO 15 U.S.C. § 78u-4(C)(1) AND RULE 11

---

[1] For case management purposes, all filings in the related cases should be made on the *Berg* docket, No. 17-cv-5016. Dkt. 128.

<strong>TABLE OF CONTENTS</strong>

Table of Contents .................................................................................................................... i

Table of Authorities ............................................................................................................... ii

Introduction ........................................................................................................................... 1

Background .............................................................................................................................. 3

    A.    The mootness fee racket ...................................................................................... 3

    B.    The Akorn strike suits .......................................................................................... 4

    C.    Frank's motion to intervene ............................................................................... 6

    D.    Disgorgement of attorneys' fees ...................................................................... 7

    E.    The consolidated appeals .................................................................................... 8

    F.    The persistence of the mootness fee racket ................................................. 10

Argument .............................................................................................................................. 11

I.    Dismissal should be vacated so that the Court can proceed with the inquiry required by the PSLRA and Rule 11 ........................................................................................ 12

    A.    Intervenor Frank meets the threshold requirements for Rule 60 .................. 13

    B.    The equities favor granting Rule 60 relief. .................................................... 14

    C.    Akorn shareholders, including Frank, were harmed by the violation of Rule 11. ............................................................................................................... 15

II.    Plaintiffs' suits were filed for an improper purpose, and the Court should order the attorneys to show cause they should not be sanctions under Rule 11. ........................ 16

    A.    None of the complaints pleaded material errors or omissions. .................... 17

        1.    Alleged Omissions 1-8 were exhaustively considered by the Court. ...... 18

        2.    Alleged Omission 9: Fresenius's offers to Kapoor described accurately ... 19

        3.    Alleged Omission 10: net debt from J.P. Morgan's analysis .................... 21

        4.    Alleged Omission 11: post-merger employment offers not omitted ...................... 21

        5.    Alleged Omission 12: confidentiality agreements are standard .............. 22

        6.    Alleged Omission 13: the board obviously wanted a better offer .......... 22

    B.    Plaintiffs offer no reason to believe they are responsible for the Definitive Statement, which contradicts their prior conduct and representations. .................... 23

    C.    The Supplemental Disclosures could not possibly have mooted Plaintiffs' pleadings, suggesting counsel simply needed an excuse to seek fees. ........................... 23

III.    The Court has discretion to fashion appropriate remedies ........................................ 24

Conclusion ........................................................................................................................... 25

CERTIFICATE OF SERVICE .............................................................................................. 26

TABLE OF AUTHORITIES

**Cases**

*Alcarez v. Akorn, Inc.,*
99 F.4th 368 (7th Cir. 2024). ................................................................. 1, 2, 3, 8-9, 11, 14, 15, 18

*Assad v. DigitalGlobe, Inc. at al.,* Nos. 17-cv-1097, -1140, -1159, -1190, -1570,
2017 WL 3129700 (D. Colo. Jul. 21, 2017) ................................................................. 18

*Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.,*
843 F.2d 808 (4th Cir. 1988) ................................................................. 15

*Blaney v. West,*
209 F.3d 1027 (7th Cir. 2000) ................................................................. 12

*Buck v. Davis,*
580 U.S. 100 (2017) ................................................................. 13

*Bushansky v. Remy Intl., Inc.,*
262 F.Supp.3d 742 (S.D. Ind. 2017) ................................................................. 18

*Di Vito v. Fidelity Deposit Co.,*
361 F. 2d 936 (7th Cir. 1966) ................................................................. 14

*English v. Narang,* No. 2018-0221-AGB,
2019 WL 1300855, 2019 Del. Ch. LEXIS 94 (Del. Ch. Mar. 20, 2019) ................................................................. 22

*Frank v. Elgamal,*
2014 Del. Ch. LEXIS 37, 2014 WL 957550 (Del. Ch. 2014) ................................................................. 20

*House v. Akorn, Inc.,*
385 F. Supp. 3d 616 (N.D. Ill. 2019) ................................................................. 1, 8, 16, 17, 21

*House v. Akorn, Inc.,* No. 17-cv-5018,
2018 WL 4579781, 2018 U.S. Dist. LEXIS 163924 (N.D. Ill. Sep. 25, 2018) ................................................................. 7

*Kuebler v. Vectren Corp.,*
13 F.4th 631 (7th Cir. 2021) ................................................................. 20, 21

*Mack v. Resolute Energy Corp.,* No. 19-cv-77-RGA,
2020 U.S. Dist. LEXIS 46776 (D. Del. Mar. 18, 2020) ................................................................. 18

*Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.,* No. CV-21-01995-PHX-JJT,
2023 U.S. Dist. LEXIS 20571 (D. Ariz. Feb. 7, 2023) ................................................................. 18

*Parshall v. Stonegate Mortg. Corp.*,
    2017 WL 3530851 (S.D. Ind. Aug. 11, 2017) ....................................................24

*Pearson v. NBTY, Inc.*,
    772 F.3d 778 (7th Cir. 2014) ....................................................................14

*Pearson v. Target Corp.*,
    893 F.3d 980 (7th Cir. 2018) ("*Pearson II*") ........................................ 12, 13

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) ..............................................................................12

*Philos Techs., Inc. v. Philos & D, Inc.*,
    645 F.3d 851 (7th Cir. 2011) ............................................................ 12, 14

*Randall v. Merrill Lynch*,
    820 F.2d 1317 (D.C. Cir. 1987) ..............................................................15

*Robert F. Booth Trust v. Crowley*,
    687 F.3d 314 (7th Cir. 2012) ..................................................................15

*Robb v. Norfolk & Western Ry.*,
    122 F.3d 354 (7th Cir. 1997) ..................................................................14

*Safeco Ins. Co. of Am. v. American Int'l Group, Inc.*,
    710 F.3d 754 (7th Cir. 2013) ..............................................................12-13

*In re Sauer-Danfoss*,
    65 A.3d 1116 (Del. Ch. 2011) .......................................................... 19, 22

*Scott v. Vantage Corp.*,
    64 F.4th 462 (3d Cir. 2023) ....................................................................24

*In re Stericycle Sec. Litig.*,
    35 F.4th 555 (7th Cir. 2022) ..................................................................14

*In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*,
    869 F.3d 551 (7th Cir. 2017) ..................................................................18

*In re Trulia, Inc. Stockholder Litig.*,
    129 A.3d 884 (Del. Ch. 2016) ..................................................................3

*United States v. Indoor Cultivation Equip. from High Tech Indoor Garden Supply*,
    55 F.3d 1311 (7th Cir. 1995). ................................................................12

*In re UAL Corp.*,
    411 F.3d 818 (7th Cir. 2005) ...................................................................................15

*In re Walgreen Co. Stockholder Litig.*,
    832 F.3d 718 (7th Cir. 2016) ("*Walgreen*") ............................... 1, 3, 5, 6, 7, 16, 18, 20, 23

## Rules and Statutes

15 U.S.C. § 78u–4(c)(6) ...................................................................1, 9, 11, 12, 16, 18, 25

Fed. R. Civ. P. 11 ..........................................................................................*passim*

Fed. R. Civ. P. 11(b) .......................................................................................9, 12, 16

Fed. R. Civ. P. 11(b)(1) .........................................................................................16

Fed. R. Civ. P. 11(b)(2) .........................................................................................16

Fed. R. Civ. P. 11(b)(3) .........................................................................................16

Fed. R. Civ. P. 11(b)(4) .........................................................................................16

Fed. R. Civ. P. 11(c)(1) ...........................................................................................1

Fed. R. Civ. P. 11(c)(4) ........................................................................................1, 9

Fed. R. Civ. P. 23 ...................................................................................................4

Fed. R. Civ. P. 60(b) .....................................................................1, 9, 11, 12, 13, 15

Fed. R. Civ. P. 60(b)(4) .........................................................................................12

Fed. R. Civ. P. 60(b)(6) ...........................................................................12, 13, 15

Fed. R. Civ. P. 60(c)(1) .........................................................................................14

Advisory Committee Notes on 2003 Amendments to Rule 23 ...............................................

## Other Authorities

Matthew Bultman, *Individual Merger Suits Replacing Class Action in Strategy Shift*,
    BLOOMBERG L. (Oct. 13, 2022) ("Bultman") ..........................................................10-11

Matthew D. Cain, Jill E. Fisch, Steven M. Davidoff Solomon & Randall S. Thomas,
*The Shifting Tides of Merger Litigation*, 71 VAND. L. REV. 603 (2018) ("Cain")................................4

Matthew D. Cain, Jill E. Fisch, Steven M. Davidoff Solomon & Randall S. Thomas,
*Mootness Fees*, U. PENN, INST. FOR LAW & ECON, Research Paper No. 19-26 (2019)
("*Mootness Fees*") ...................................................................................................................10

Matthew D. Cain, Jill E. Fisch, Steven M. Davidoff Solomon & Randall S. Thomas,
*Beyond Wickedness: Managing Complex Systems and Climate Change*,
73 VAND. L. REV. 1777 (2019) ("*Beyond Wickedness*") ...............................................................4

Bryce Elder, *Stocks to Watch*, FINANCIAL TIMES (Feb, 27, 2018)................................................6

Jill E. Fisch, Sean J. Griffith & Steven M. Davidoff Solomon, *Confronting the Peppercorn
Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*,
93 TEX. L. REV. 557 (2015) ........................................................................................................3

Browning Jeffries, *The Plaintiffs' Lawyer's Transaction Tax: The New Cost of Doing Business in
Public Company Deals*, 11 BERKELEY L.J. 55 (2014) .......................................................................3

Kevin LaCroix, *Will the Seventh Circuit's Recent Opinion Deter Merger Objection Lawsuits?*,
THE D&O DIARY (Apr. 24, 2024), ...........................................................................................11

Anthony Rickey, *Absent Reform, Little Relief in Sight From Chronic "Merger Tax" Class-Action
Litigation*, LEGAL BACKGROUNDER, Washington Legal Foundation (Aug. 25, 2017).............10

**INTRODUCTION**

Five years ago, this Court found that securities suits against Akorn, Inc. and its board "provided Akorn's shareholders nothing of value, and instead caused the company in which they hold an interest to lose money." *House v. Akorn, Inc.*, 385 F. Supp. 3d 616, 623 (N.D. Ill. 2019). The Court concluded that this was the "racket" described by *In re Walgreen Co. Stockholder Litigation*, and ordered that the three plaintiffs who had not disclaimed interest in attorneys' fees disgorge the money to Akorn. *Id.* (citing *Walgreen*, 832 F.3d 718, 725 (7th Cir. 2016)).

The Seventh Circuit approvingly quoted the Court's findings, and remanded with instructions to treat Frank as an intervenor. *Alcarez v. Akorn, Inc.*, 99 F.4th 368, 378 (7th Cir. 2024). Intervention should have been granted because "[i]t was possible to grant the sort of relief Frank requested." *Id.* at 375. The Court's disgorgement order rested on its inherent authority, but its analysis "should have been to §78u-4(c)(1) and Rule 11, [and] with that change the analysis holds." *Id.* at 377. The Seventh Circuit remanded so that Frank could file this "necessary" Rule 60(b) motion, which empowers to court to "select[] an appropriate remedy (if any)" following requisite Rule 11 process, which is "[m]andatory" under the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(c)(1).

This is the Seventh Circuit's suggested motion. Frank moves to reopen the dismissals under Rule 60(b) and simultaneously moves for an order to show cause under Rule 11 why sanction should be imposed regarding Plaintiffs' racket.[2] In the past four years—a year *after* this Court found that certain plaintiffs' complaints sought no material disclosures—the attorneys and law firms that filed the four Plaintiffs' complaints filed **over 950 similar strike suits**. Proposed Complaint ("Complaint"), ¶¶ 85-97. Few of these cases were litigated. *Id.* ¶ 95. As in this case, the vast majority of complaints

---

[2] Plaintiffs may complain that a motion for order to show cause cannot be considered until Rule 60(b) relief is granted, but Frank combines briefing on motions to avoid lengthy serial litigation the Court appropriately hopes to avoid. Dkt. 125.

To the extent the motion is granted, Plaintiffs' counsel will have a further opportunity to respond to the Court's order to show cause, which is required under Rule 11(c)(1), (4); *see also Alcarez*, 99 F.4th at 377. Frank intends to respond to Plaintiffs' filings at that time, but includes his primary arguments here to anticipate Plaintiffs' arguments that the motion should be denied for alleged mootness or impossibility of meaningful relief.

sought likely immaterial and cumulative disclosures in order to extract fees under the color of the PSLRA. As detailed in the contemporaneously-filed Complaint, the racket appears to have evolved in recent years. Strike suit plaintiffs now rarely file suits. They usually instead send demand letters to merging companies seeking immaterial disclosures, followed by demands for "mootness fees," siphoning corporate funds to the detriment of shareholders like Intervenor Frank.

The Court cannot halt this practice, but in exercising its "discretion over the choice of sanction" (*Alcarez*, 99 F.4th at 378), it can require Plaintiffs to disclose any forthcoming sanction order to future courts and parties.[3] Plaintiffs may also be ordered to disclose all of the mootness settlements they obtained—including those obtained through demand letters—which otherwise remain hidden from courts, lawmakers, and the public. The Court need not decide what remedies might be appropriate at this time, and Frank does not now move for sanctions. But in Section III, Frank sketches out potential remedies to demonstrate that they have not been mooted by Plaintiffs' disclaimer of attorneys' fees, disgorgement, nor by Akorn's bankruptcy. It remains "possible to grant the sort of relief Frank requested." *Id.* at 375.

Plaintiffs Berg, Alcarez, and Harris filed complaints seeking disclosures no more material than plaintiff House, whose complaint the Court found lacking in 2019. Because none of the Plaintiffs sought disclosures that could have been material—and because they agreed to dismiss their complaints as "moot" without having achieved most of their pretextual demands—the Court should infer they were likely filed for the "improper purpose" of "needlessly increase[ing] the cost of litigation."

The Court should order Plaintiffs (which includes all of their originally-signing counsel) to show cause that they should not be sanctioned under Rule 11.

---

[3] In this memorandum, Frank used the term "Plaintiffs" to refer to the named plaintiffs in each of the four actions—Berg, Alcarez, House, and Harris—*and* non-local settling counsel who signed each of the original complaints. **For Berg:** Gina M. Serra (Rigrodsky Law P.A.); Brian D. Long (LongLaw, LLC); Richard A. Maniskas (RM Law, P.C.). **For Alcarez:** Donald J. Enright, Elizabeth K. Tripodi (Levi & Korsinsky, LLP). **For House:** Jaun E. Monteverde (Monteverde & Associates PC). **For Harris:** James M. Wilson, Jr., and Nadeem Faruqi (Faruqi & Faruqi, LLP). Frank suggests that any sanctions apply to all these counsel, and also to each of their respective law firms.

BACKGROUND

### A.        The mootness fee racket

"In merger litigation the terms 'strike suit' and 'deal litigation' refer disapprovingly to cases in which a large public company announces an agreement that requires shareholder approval to acquire another large company, and a suit, often a class action, is filed on behalf of shareholders of one of the companies for the sole purpose of obtaining fees for the plaintiffs' counsel." *Walgreen*, 832 F.3d at 721. Plaintiffs can extract profitable settlements at the expense of shareholders regardless of the merit of the suit. "Because the litigation threatens the consummation of the deal if not resolved quickly and because corporations may view the settlement amount as a drop in the bucket compared to the overall transaction amount, defendants are motivated to settle even meritless claims." Browning Jeffries, *The Plaintiffs' Lawyer's Transaction Tax: The New Cost of Doing Business in Public Company Deals*, 11 BERKELEY L.J. 55, 58 (2014); *cf. Alcarez*, 99 F.4th at 374 ("The mootness fees may well have cost Akorn less than what its own lawyers would have billed to defend the suits… [so] directors did not violate either the duty of care or the duty of loyalty when paying to buy peace."). Merger strike suits typically leverage the threat of a time-sensitive motion for preliminary injunction. Jill E. Fisch, Sean J. Griffith & Steven M. Davidoff Solomon, *Confronting the Peppercorn Settlement in Merger Litigation: An Empirical Analysis and a Proposal for Reform*, 93 TEX. L. REV. 557, 565-66 (2015). Settlements of these actions rarely provided monetary relief for the class members but instead, usually consist solely of supplemental disclosures in the merger proxy statement filed with the Securities and Exchange Commission ("SEC"). *Id.* at 559. Disclosure-only settlements "do not appear to affect shareholder voting in any way." *Id.* at 561.

Crafty class counsel created a cottage industry: "In 2012, 93% of deals over $100 million and 96% of deals over $500 million were challenged in shareholder litigation." *Id.* at 558-59. Judicial acquiescence to such tactics "caused deal litigation to explode in the United States beyond the realm of reason." *Walgreen*, 832 F.3d at 725 (quoting *In re Trulia, Inc. Stockholder Litig.*, 129 A.3d 884, 894 (Del. Ch. 2016)). Actual class action *settlements* declined after 2016 in the wake of *Walgreen* and *Trulia*.

Plaintiffs adapted with an end-run around the scrutiny that *Walgreen* and *Trulia* demand, by settling for attorneys' fees *without* seeking class release. Whereas class-action or derivative settlements

allow shareholders to object, like a shareholder did in *Walgreen*, Plaintiffs' racket extorted payment without class notice and without seeking or receiving court approval under Rule 23. Instead, merger plaintiffs discovered it's easier to extract nuisance payments from defendants by stipulating dismissal of the underlying complaint, then negotiating for "mootness fees," a Delaware procedural device. "These cases appear to indicate that plaintiffs' counsel may be extracting rents by seeking low cost payments to 'go away.'" Matthew D. Cain, Jill E. Fisch, Steven M. Davidoff Solomon & Randall S. Thomas, *The Shifting Tides of Merger Litigation*, 71 VAND. L. REV. 603, 632 (2018) ("Cain").

Because of this shift in tactics—exemplified by Plaintiffs' 2017 complaints against Akorn, deal litigation rebounded. In 2016, 73% of mergers worth over $100 million faced strike suits, down from 97.5% in 2013. *Id.* at 603. This figure rose to 85% and 83% in 2018-19, with plaintiffs rarely seeking court approval of their settlements. *Id.*; Matthew D. Cain, Jill E. Fisch, Steven M. Davidoff Solomon & Randall S. Thomas, *Beyond Wickedness: Managing Complex Systems and Climate Change*, 73 Vand. L. Rev. 1777, 1787 (2019) ("*Beyond Wickedness*").

### B.  The Akorn strike suits

On May 22, 2017, Akorn, Inc., filed a preliminary definitive proxy statement with the SEC recommending that shareholders approve a proposed merger with German pharmaceutical company Fresenius Kabi AG. Complaint Ex. 1 ("Preliminary Proxy").[4] The Preliminary Proxy and the non-preliminary Definitive Proxy filed on June 15, 2017 Complaint Ex. 2 ("Definitive Proxy"),[5] were prepared by Akorn's outside counsel. Each described the $4.3 billion transaction. Like all such proxies, it was rife with detail; the Definitive Proxy totaled 82 pages with another 153 pages of exhibits. *Id.*

From June 2 to 22, 2017, six plaintiffs filed actions alleging that these proxy statements were "false and misleading"—*not* because anything said in those pages was actually false, but rather based on a "tell me more" theory that Akorn's failure to disclose still more subsidiary details violates Sections 14(a) and 20(a) of the Exchange Act. On June 26, 2017 one of the plaintiffs filed a motion for

---

[4]  www.sec.gov/Archives/edgar/data/3116/000130817917000183/lakrx2017_pre14a.htm.

[5]  www.sec.gov/Archives/edgar/data/3116/000130817917000193/lakrx2017_defm14a.htm.

preliminary injunction to halt the merger vote scheduled for July 19. No. 17-cv-5022, Dkt. 6. Other plaintiffs joined this motion on July 5, 2017, citing the urgency of this motion as a reason to deny defendant's motion to transfer the cases to the Northern District of Illinois. Dkt. 37 at 6. This forced the Louisiana district court to expeditiously resolve the motion to transfer, which was granted the same day. Dkt. 40. Upon transfer, each of the six plaintiffs' suit was assigned to a different judge.

On July 10, 2017, Akorn filed a Form 8-K with the SEC, which contained supplemental disclosures. Akorn prefaced these disclosures by denying that they were material:

> Akorn believes that the claims asserted in the Federal Merger Litigation are without merit and no supplemental disclosure is required under applicable law. . . . Akorn specifically denies all allegations in the Federal Merger Litigation that any additional disclosure was or is required.

Complaint Ex. 3 ("Supplemental Disclosure").[6]

On July 14, 2017, all six plaintiffs moved to dismiss their complaints without prejudice, claiming that the supplement had mooted every complaint. Dkt. 54 at 4. Plaintiffs retained jurisdiction to file a request for attorneys' fees on behalf of all six plaintiffs in the first-filed *Berg* action. *Id.* at 6.

Meanwhile, Akorn shareholders voted on the proposed transaction at a special meeting of its shareholders at its Lake Forest, Illinois headquarters on July 19, 2017.[7] The votes in favor of the transaction totaled 104,651,745, with only about *0.1%* of that amount—104,914 shares—voted in opposition. *Id.* Over 99.8% of votes favored the transaction, and the Supplemental Disclosure made no material difference in the vote. *Id.*; *cf. Walgreen*, 832 F.3d at 723 (finding it "inconceivable that the six disclosures" attributed to plaintiffs affected merger where 97% of shareholders approved).

On September 15, 2017, in the *Berg* action, the parties filed a stipulation and proposed order indicating that "Defendants have agreed to provide Plaintiffs with a single payment of $322,500 in attorneys' fees and expenses to resolve any and all Fee Claims, and thus there are no Fee Claims to be adjudicated by the Court." Dkt. 56 at 6.

---

[6] https://www.sec.gov/Archives/edgar/data/3116/000095015717001057/form8k.htm.

[7] https://www.sec.gov/Archives/edgar/data/3116/000095015717001099/form8k.htm.

C.       Frank's motion to intervene

Three days after plaintiffs filed their fee stipulation, Frank, as an aggrieved shareholder and putative class member, moved to intervene in each of the six actions because the plaintiffs' settlement for payment of fees contravenes *Walgreen*: a proposed "class action that yields fees for class counsel and nothing for the class—is no better than a racket. It must end." Dkt. 57; Dkt. 57-1 at 2 (quoting 832 F.3d at 724). In order to thwart the racket, Frank's proposed intervenor complaint sought (1) an accounting of attorneys' fees received by plaintiffs, (2) disgorgement of any such unjust enrichment, (3) sanctions, and (4) a permanent injunction "prohibiting Settling Counsel from accepting payment for dismissal of class action complaints filed under the Exchange Act without first obtaining court adjudication of their entitlement to any requested fee award." Dkt. 57-1 at 20-21.

As Frank's motion to intervene was pending, the Akorn merger collapsed. On February 27, 2018, Fresenius announced it was investigating alleged FDA regulatory violations by Akorn, unrelated to any of the plaintiffs' underlying allegations. *See* Dkt. 91-2 at 1-2. The stock price fell nearly 40%, confirming that the transaction plaintiffs challenged would have been very beneficial to shareholders. Bryce Elder, *Stocks to Watch,* Financial Times (Feb, 27, 2018).

On March 13, 2018, before Fresenius officially rescinded its merger offer, plaintiff Berg filed a motion seeking to withdraw from the case and forgo any entitlement to the $322,500 in attorneys' fees, which he claimed rendered Frank's motion to intervene "moot." No. Dkt. 91-2. Frank opposed Berg's suggestion, but at a March 21 hearing, the Court remarked that the underlying relief requested in Frank's intervenor complaint would be moot because of plaintiffs' disclaimer of fees *and* because "I'm not going to enter injunctive relief." Dkt. 108 at 12; *see also* Dkt. 109 at 3 (reiterating Court's views at April 11 hearing). On May 2, the Court held a status conference for all six actions at which counsel for three plaintiffs (Berg, Harris, and Alcarez) disclaimed their entitlement to attorneys' fees. Dkt. 110 at 8-9. Counsel for three other plaintiffs (House, Pullos and Carlyle) indicated that they still sought a share of the $322,500 attorneys' fee payment. *Id.* With respect to the "disclaiming" plaintiffs, the Court denied intervention because it would not have granted relief except disgorgement, which

those plaintiffs effectuated by abandoning their claim to attorneys' fees. Dkt. 103. Frank timely appealed this denial of intervention. Dkt. 104.

With respect to plaintiff House, after further briefing the Court denied intervention because class claims were not released by Plaintiffs' settlement, but the Court invited Frank "to continue to participate in this case as an amicus curiae, because the Defendants have abandoned the adverse perspective necessary for the Court to determine this issue." *House v. Akorn, Inc.*, No. 17-cv-5018, 2018 WL 4579781, 2018 U.S. Dist. LEXIS 163924, at *11 (N.D. Ill. Sep. 25, 2018). Frank timely appealed denial of intervention with respect to plaintiff House only, whose counsel (Monteverde) retained the $322,500 payment on behalf of the three non-disclaiming plaintiffs. No. 17-cv-5018, Dkt. 57.

### D. Disgorgement of attorneys' fees

At the Court's invitation, Frank advised that he was willing to serve as an *amicus* regarding whether the fees should be disgorged. No. 17-cv-5018, Dkt. 54. The three remaining plaintiffs—including House—filed a joint brief attempting to rationalize their fee award based on five alleged supplemental disclosures they claimed to have secured from Akorn. No. 17-cv-5018, Dkt. 65 at 9-15.

Frank responded to these materiality arguments and further contended that the Court could not infer plaintiffs were responsible for the two of the disclosures, which were made in Akorn's June 15, 2017 Definitive Proxy—just three days after House filed suit. No. 17-cv-5018, Dkt. 67 at 7. Akorn never conceded plaintiffs' responsibility for differences between the preliminary and definitive proxy statement, and no Plaintiff asserted such benefit until December 22, 2017, when plaintiff Berg briefed his second opposition to Frank's motion to intervene. *Id.* at 8. The non-disclaiming plaintiffs replied with new arguments that *Walgreen* does not apply at all outside of class action settlements, and that *Walgreen* somehow endorsed Delaware's mootness fee procedure, which they claimed to follow. No. 17-cv-5018, Dkt. 75 at 2-3. In sur-reply, Frank pointed out that *Walgreen*'s command to "dismiss[] out of hand" could not be limited to class settlements, and that even if Delaware procedure applied, plaintiffs failed to provide notice which is mandatory in Delaware so that shareholders like Frank can object to mootness fee payments. No. 17-cv-5018, Dkt. 77.

On June 24, 2019 the Court exercised its inherent authority and ordered the non-disclaiming plaintiffs to return the $322,500 payment to Akorn. *House*, 385 F. Supp. 3d at 623. While House and Frank briefed the materiality of disclosures allegedly *achieved* by Plaintiffs, the Court determined it should instead look to the relief *sought* in plaintiffs' underlying complaints. *Id.* at 619. The Court identified eight disclosures sought by at least one of the non-disclaiming plaintiffs' complaints: (1) GAAP reconciliation for certain non-GAAP financial projection metrics; (2) component numbers for J.P. Morgan's analysis; (3) that J.P. Morgan's fee payable "immediately prior to the consummation of the merger" was in fact contingent on the merger occurring; (4) J.P. Morgan's past compensation from Fresenius; (5)-(7) three disclosures sought by only plaintiff Carlyle; and (8) that the board considered pending derivative litigation in recommending the merger. *Id.* at 619-22. Notably, only three of these eight disclosures (1, 3, and 8) were even arguably contained in any SEC filing. *Id.*. The Court found that none of the eight alleged omissions in Akorn's disclosures could have been plainly material under *Walgreen* and were instead "worthless to the shareholders." *Id.* at 623. "Akorn paid Plaintiffs' attorney's fees to avoid the nuisance of ultimately frivolous lawsuits disrupting the transaction with Frensenius." *Id.* The suit should have been "dismissed out of hand" before plaintiffs could execute their racket. *Id.* "Since the Court failed to take that action," it ordered the attorneys' fees disgorged. *Id.* The non-disclaiming plaintiffs confirmed their return of the money on July 3, 2019. No. 17-cv-5018, Dkt. 83.

House and Carlyle appealed this decision. *E.g.* No. 17-cv-5018, Dkt. 80.

### E.    The consolidated appeals

The Seventh Circuit consolidated Frank's appeals against the disclaiming plaintiffs and heard that argument on November 6, 2018. The same panel stayed Frank's appeal of denial of intervention against plaintiff House, consolidating this appeal with the two appeals of the Court's disgorgement order, which it heard on April 14, 2020. The panel's 2024 opinion resolved all six appeals.

Although the Seventh Circuit found that House and Pullos lacked standing for their appeals—which sought money for their attorneys rather than the nominal plaintiffs (*Alcarez*, 99 F.4th at 374)—it found merit to their argument that this Court lacked jurisdiction to issue its disgorgement order. *Id.*

"Fed. R. Civ. P. 60(b) allows judges to reopen cases, that must be done 'on motion', according to the Rule, and none of the litigants had filed a motion." *Id.* The panel found this problem could be overcome by permitting Frank to intervene. *Id.* The panel found that Frank *does* have standing to intervene from his concrete "loss from diversion of corporate money." *Id.* Frank did not first need to demand action by Akorn's board because he did not plead a derivative action; the loss occurred through putative class counsel violating "their duties to *him* when they used the class allegations as leverage to obtain private benefits." *Id.* (emphasis in original). The panel found that intervention should have been granted because it remains "possible to grant the sort of relief Frank requested." *Id.* at 375. That said, Frank's originally-proposed remedies were "not satisfactory" because disgorgement "would be appropriate only if the mootness fees had been retained by counsel," and " would not be proper objects of injunctive relief unless they were added as parties." *Id.* at 376.

That said, further proceedings remain necessary because of 15 U.S.C. § 78u-4(c)(1), which provides for "[m]andatory review" of private PSLRA actions "upon final adjudication of the action," which "shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint..." *Id.* at 376. The panel found that dismissal was such a "final adjudication of the action," and so a Rule 11 inquiry should determine whether, as Frank contends, the suits needlessly increased the cost of litigation. *Id.* at 377.

Finally the panel approvingly quoted the Court's 2019 disgorgement order (*House*), and found that the Court's "reference to 'inherent authority' should have been to §78u-4(c)(1) and Rule 11, but with that change the analysis holds." *Id.* This evaluation requires a formal motion under Rule 60(b) by Frank, who the panel instructed to treat as in intervenor. *Id.* "Rule 11(c)(4) gives the district judge discretion over the choice of sanction," but " selecting an appropriate remedy (if any) should await resolution of the proceedings under §78u-4(c)(1) and, derivatively, Rule 11." *Id.*

The panel thus remanded so that Intervenor Frank could file the present Rule 60(b) motion, which enables the Court to perform the Rule 11 evaluation under the PSLRA. *Id.* at 378.

### F.    The persistence of the mootness fee racket

From 2017-19, the five most active firms that filed federal mergers lawsuits were, in order, Rigrodsky & Long, RM Law, Levi & Korsinsky, Faruqi & Faruqi, and Monteverde & Associates— precisely the firms that represented all four remaining Plaintiffs. *See* Complaint Ex. 8, Matthew D. Cain, Jill E. Fisch, Steven M. Davidoff Solomon & Randall S. Thomas, *Mootness Fees*, U. PENN, INST. FOR LAW & ECON, Research Paper No. 19-26 (2019) ("*Mootness Fees*") at 21.[8] Rigrodsky & Long individually filed suits in 60% all 250 merger transactions that attracted suits in the studied period. *Id.* All five Plaintiffs' firms filed a total of 497 federal lawsuits in this period. *Id.* at 22. Plaintiffs' firms achieved mootness fee payoffs in at least 65% of the suits they filed (*id.* at 21), and Monteverde was the most efficient, with "the highest percentage (80%) of cases in which they obtained a mootness fee." *Id.* at 22. Vanishingly few suits were litigated toward settlement. *Id.* "Based on these data, we conclude that these law firms appear to be more interested in collecting mootness fees than in actively litigating the cases that they file." *Id.* Plaintiffs' firms have settled other federal strike suits for six-figure "mootness fees," without the safeguards of settlement approval under Rules 23 or 23.1, or, indeed, any court hearing, much less notice to the class. *See* Dkt. 83-1 (Bednarz Decl.) at 10; Anthony Rickey, *Absent Reform, Little Relief in Sight From Chronic "Merger Tax" Class-Action Litigation*, LEGAL BACKGROUNDER, Washington Legal Foundation, at 4 (Aug. 25, 2017).[9]

From 2018 to 2021 repeat filers of such suits— including Plaintiffs' counsel—changed their tactics: eschewing class action filings in favor of individual actions. Matthew Bultman, *Individual Merger Suits Replacing Class Action in Strategy Shift*, BLOOMBERG L. (Oct. 13, 2022) ("Bultman").[10] For a time, the volume of filings did not



---

[8] Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3398405.

[9] Available at: www.wlf.org/upload/legalstudies/legalbackgrounder/082517LB_Rickey.pdf.

[10] Available online at: https://news.bloomberglaw.com/securities-law/individual-merger-suits-replacing-class-action-in-strategy-shift or https://archive.is/dR7pZ (archive link).

decline. In fact, 2021 was likely the all-time high-water mark for filings alleging deficient disclosures in connection with a merger transaction under the PSLRA. Prof. Jill Fisch observed about this strategic shift: "If the purpose of the lawsuit is to try to generate a fee for the lawyer to make the case go away, it's a lot easier to do that in an individual action." *Id.*

The evolving racket makes the problem increasingly obscure. In the last two years, merger strike suits have fallen out of fashion, with attorneys instead settling for nuisance fees demanded through letter written to corporate boards. This is evident by the precipitous decline in strike suit filings by Plaintiffs' firms, who collectively filed 153 merger strike suits from Jan. 1-Mar. 31, 2021, but over the same dates in 2024 only one of the firms—Long Law—filed any suits, a total of only 39. Complaint ¶ 98. Recent corporate disclosures confirm that the racket has evolved into a high-volume letter-writing business. For example, a recent SEC disclosure by a merging company disclosed that the merging entities received *eleven demand letters* from purported shareholders. *Id.* at ¶ 101. It regarded them as meritless, but "in order to avoid nuisance, cost and distraction," the company offered supplemental disclosures. *Id.* Defendants apparently continue to pay mootness fees for such letters, but the magnitude of nuisance payments borne by shareholders like Frank cannot be ascertained.[11] Prof. Jessica Erickson remarked that "I think it's a problem we're stuck with until [lawmakers] decide that they've had enough." Bultman. Merger transactions are simply too ephemeral, so courts, lawmakers, and shareholders are now in the dark—unless plaintiffs' counsel were required disclose their ongoing racket, which Frank suggests as an appropriate sanction.

## ARGUMENT

The Seventh Circuit remanded this case for further proceedings under 15 U.S.C. § 78u-4(c)(1) of the PSLRA, which "obliges" the Court "to determine whether each suit was proper at the moment it was filed." *Alcarez*, 99 F.4th at 376. In order to accomplish this, "a formal motion under Rule 60(b) is necessary." *Id.* at 377. Once reopened, the Court is free to conduct the mandatory PSLRA review.

---

[11] Kevin LaCroix, *Will the Seventh Circuit's Recent Opinion Deter Merger Objection Lawsuits?*, THE D&O DIARY (Apr. 24, 2024), available at: https://www.dandodiary.com/2024/04/articles/merger-litigation/will-the-seventh-circuits-recent-opinion-deter-merger-objection-lawsuits/.

## I.   Dismissal should be vacated so that the Court can proceed with the inquiry required by the PSLRA and Rule 11.

Intervenor Frank meets the standard to vacate dismissals in each of Plaintiffs' actions under Rule 60(b). The rule permits the Court to vacate any earlier judgment because the "judgment is void" or for "any other reason that justifies relief." Rule 60(b)(4), (b)(6). Both conditions exist here.

A judgment may be void when "although having jurisdiction over the parties and subject matter, entered a decree 'not within the powers granted to it by the law.'" *United States v. Indoor Cultivation Equip. from High Tech Indoor Garden Supply*, 55 F.3d 1311, 1316 (7th Cir. 1995). This occurred in two ways. *First*, Plaintiffs' dismissals purported to rob the Court of its jurisdiction to conduct a "[m]andatory review" under § 78u-4(c)(1). Entry of dismissal therefore violated the PSLRA and must be set aside so that the Court can "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b)…as to any complaint." § 78u-4(c)(1). *Second*, Plaintiffs and their putative class counsel fell failed to provide constitutionally adequate notice and representation to their putative class members. *E.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). A judgment is void when "the court that rendered it lacked jurisdiction or acted in a manner inconsistent with due process of law." *Blaney v. West*, 209 F.3d 1027, 1031 (7th Cir. 2000). Counsel provided shareholders notice indicating that they intended to litigate PSLRA claims. Ex. 9. But instead they settled for private payoff without first alerting putative class members of the deception. While an absent class member does not need to be afforded as much process as a party, "due process additionally required … an opportunity to respond." *Blaney*, 209 F.3d at 1031. Because Plaintiffs provided no notice whatsoever, their dismissals are void. District courts have "little leeway" in deciding a Rule 60(b)(4) motion: "Once a district court decides that the underlying judgment is void, the trial judge has no discretion and must grant the appropriate 60(b) relief." *Id.* at 1031; *Philos Techs., Inc. v. Philos & D, Inc.*, 645 F.3d 851, 855 (7th Cir. 2011).

Rule 60(b)(6) also supports relief. This "flexible" rule "gives courts wide discretion." *Pearson v. Target Corp.*, 893 F.3d 980, 984 (7th Cir. 2018) ("*Pearson II*") (reversing and remanding denial of Rule 60(b)(6) relief to class member Theodore H. Frank); *Safeco Ins. Co. of Am. v. American Int'l Group, Inc.*,

710 F.3d 754, 758 (7th Cir. 2013) (disgruntled class members may seek relief under Rule 60(b)(6)). While "available only in 'extraordinary circumstances,' … courts may consider 'a wide range of factors' to determine if 'extraordinary circumstances are present.'" *Pearson II*, 893 F.3d at 984 (quoting *Buck v. Davis*, 580 U.S. 100, 123 (2017)). These factors include "'the risk of injustice to the parties' and 'the risk of undermining the public's confidence in the judicial process.'" *Buck*, 580 U.S. at 123. *Pearson II* illustrates this principle. There, alleged bad-faith objectors to a class action settlement selfishly settled their appeals in order to extract private payment with no benefit to the class. *Pearson II*, 893 F.3d at 983. The Seventh Circuit found that "Rule 60(b)'s equitable considerations" require and "an extra analytical step to ensure that the interests of the class are protected." *Id.* at 985. "Rule 60(b)(6) [acts] as a safety valve for precisely these situations." *Id.* The same applies in this controversy, because Plaintiffs entered dismissals as an end-run around the PSLRA's statutory requirements designed to protect shareholders, and the mootness fee racket risks undermining confidence in the judicial process.

## A. Intervenor Frank meets the threshold requirements for Rule 60.

All Rule 60 motions "must be made within a reasonable time," and Intervenor Frank timely moves here. He first moved to intervene in all Plaintiffs' actions within three days of the purported dismissal with prejudice in the lead *Berg* action, and has timely appealed each denial of intervention with respect to the Plaintiffs. The Seventh Circuit did not resolve these appeals until April 15, 2024, and the mandate in Frank's favor only returned on May 23 following resolution of certain Plaintiffs' unsuccessful rehearing petitions. Thus, Frank has only been a party with standing to make this motion for weeks, and much of this time was expended coordinating with Plaintiffs to file status reports.

Prior to the appeals, various plaintiffs argued that Frank's motion to intervene was untimely, hypothesizing that Frank should have intervened prior to the mootness fee settlement. This argument, renewed by various plaintiffs on appeal, was overruled by the Seventh Circuit in directing intervention. A similar argument should not preclude Frank's Rule 60(b) motion either, especially because Frank could not have even moved under Rule 60 relief prior to entry of the dismissals he seeks relief from. It wasn't until the breach of fiduciary duty and extraction of fees—until Akorn demonstrated that it

would not fight against Plaintiffs' abusive litigation tactics—that Frank had either an interest in the litigation *or* cause to reopen. No authority suggests a three-day "delay" could be unreasonable, nor the few weeks since remand.

Timeliness is an especially easy burden to meet under Rule 60(b)(4) because "the reasonable time limitation in Rule 60(c)(1) must generally mean no time limit, at least absent exceptional circumstances." *Philos Techs.*, 645 F.3d at 857 (cleaned up) (reversing denial of Rule 60(b)(4) relief).

### B. The equities favor granting Rule 60 relief.

Courts evaluate motions under Rule 60(b) based on all facts and circumstances; "the relief provided by Rule 60(b) is equitable in character and to be administered upon equitable principles." *Di Vito v. Fidelity Deposit Co.*, 361 F. 2d 936, 939 (7th Cir. 1966). These circumstances include "the danger of prejudice" and "whether the movant acted within good faith." *Robb v. Norfolk & Western Ry.*, 122 F.3d 354, 359 (7th Cir. 1997).

The equities here strongly favor relief. Frank has litigated this case—seeking relief from the securities' law equivalent of a smash-and-grab—for seven years in good faith without compensation. The Seventh Circuit has validated the work of Frank in this case. *Alcarez*, 99 F.4th at 378. Frank and his counsel, the Center for Class Action Fairness, have frequently been praised for their work protecting class members and shareholders. *See In re Stericycle Sec. Litig.*, 35 F.4th 555, 572 & n.11 (7th Cir. 2022) (praising CCAF's "track record" and citing cases); *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (observing CCAF "flagged fatal weaknesses in the proposed settlement" and illustrates "why objectors play an essential role in judicial review of proposed settlements of class actions"); Ashby Jones, *A Litigator Fights Class-Action Suits*, Wall St. J. (Oct. 31, 2011). Frank himself has been called "the leading critic of abusive class action settlements." Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. Times (Aug. 13, 2013); *see also* Roger Parloff, *Should Plaintiffs Lawyers Get 94% of a Class Action Settlement?*, Fortune, Dec. 15, 2015 (calling Frank "the nation's most relentless warrior against class-action fee abuse").

Meanwhile, Plaintiffs' counsel have filed over a thousand similar actions since 2017, burdening courts across the country. Without relief from Plaintiffs' cynical dismissal, Frank would suffer significant prejudice as no other venue exists to pursue his steadfastly-asserted complaint except this Court. *See Alcarez*, 99 F.4th at 374 (discussing how no claim against the board likely exists). Plaintiffs suffer no credible prejudice. These proceedings arise from their own misconduct, and the "loss of a windfall is not the kind of harm that a court should endeavor to avert." *In re UAL Corp.*, 411 F.3d 818, 823-824 (7th Cir. 2005) (affirming Rule 60(b)(6) relief over parties that benefited from windfall). With Rule 60(b) relief, Plaintiffs remain free to pursue—and actually have pursued—voluminous litigation using the same improper purposes. Any harm to the parties from reopening the Settlement is typical to what any party to litigation assumes and therefore is not prejudice for the purposes of Rule 60(b). *See UAL Corp.*, 411 F.3d at 823-824; *Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 812 (4th Cir. 1988); *Randall v. Merrill Lynch*, 820 F.2d 1317, 1321 (D.C. Cir. 1987).

Delay and "[a]dditional legal costs . . . are the inevitable result whenever a judgment is vacated." *Id.* For this reason, the settling parties suffer no prejudice: they return to their prior positions with the full gamut of claims and defenses. Further proceedings are necessary because the Seventh Circuit found that the Court's disgorgement findings must come after affording the plaintiffs process under Rule 11. *Alcarez*, 99 F.4th at 377.

### C. Akorn shareholders, including Frank, were harmed by the violation of Rule 11.

Plaintiffs may renew their argument that Frank has suffered only "derivative" harm and therefore has had no cognizable interest impaired. The panel rejected this argument. *Alcarez*, 99 F.4th at 374. Seventh Circuit precedent recognizes that shareholders suffer cognizable harm from the use of corporate funds to pay attorneys' fees in meritless suits. There is no question that the "move[ment of] money from the corporate treasury to the attorneys' coffers" comes at the expense of shareholders. *See Robert F. Booth Trust v. Crowley*, 687 F.3d 314, 320 (7th Cir. 2012). Additionally, Frank is harmed by Plaintiffs' apparently-ongoing conduct. As a shareholder with diverse holdings, Frank is harmed by the pattern and practice of conduct that plaintiffs and their counsel have shown in more recent merger

transactions. *see* Complaint ¶¶ 107-108 (Plaintiffs' recent suits targeted entities acquired by companies Frank owns shares of). The underlying complaints here were shams "filed . . . for the sole purpose of obtaining fees for the plaintiffs' counsel." *Walgreen*, 832 F.3d at 724.

## II. Plaintiffs' suits were filed for an improper purpose, and the Court should order the attorneys to show cause they should not be sanctions under Rule 11.

Frank also asks the Court to enter an order to show cause that Plaintiffs' should not be sanctioned for their filing of complaints for the improper purpose of demanding attorneys' fees under the pretext of filing securities class actions under the PSLRA. The Court's 2019 *House* order, in view of Plaintiffs' business model suggests that their conduct violated § 78u-4(c)(1) and Rule 11.

All prongs of Rule 11(b) were violated. First, the complaints were filed for an improper purpose, at least to "needlessly increase the cost of litigation," which Plaintiffs' leveraged to extract a fee they were not entitled to. Rule 11(b)(1); *cf. Alcarez*, 99 F.4th at 377. Second, the complaints were "frivolous" as the Court has found with respect to plaintiff House's complaint. Rule 11(b)(1); *House*, 385 F. Supp. 3d at 623. Finally, in at least some instances, Plaintiffs' pleadings contradicted evidence known to plaintiffs. Rule 11(b)(3)-(4). For example, Plaintiffs' argument, examined by the Court as Alleged Omission 3, that the Preliminary Proxy did not disclose whether J.P. Morgan's fee was contingent: the contingent fee "can be inferred from the fact that the [percentage] fee will ultimately be measured only 'immediately prior to consummation'…" *House*, 385 F. Supp. 3d at 620-21.

Frank anticipates Plaintiffs will object with two broad lines of argument.

First, Plaintiffs may argue that the Court's order does not necessarily suggest that plaintiffs Berg, Alcarez, and Harris filed "frivolous lawsuits" as the Court found plaintiff House did. *House*, 385 F. Supp. 3d at 623. The Court should recognize the implausibility of this argument: all Plaintiffs agreed that Akorn's July 10, 2017 Supplemental Disclosure rendered their complaints moot. The Court analyzed demands that precipitated these disclosures in its order. Alleged omissions unique to the disclaiming plaintiffs' pleadings likewise sought trivial information, discussed in detail below.

Second, Plaintiffs might argue that filing complaints seeking immaterial disclosures "worthless to the shareholders" does not imply a violation of Rule 11. Perhaps plaintiffs erroneously interpreted

the law, they may argue, but not so egregiously that it ran afoul of the rules. The Court's well-reasoned order makes this notion difficult to swallow. The Court correctly found that "Akorn paid Plaintiffs' attorney's fees to avoid the nuisance of ultimately frivolous lawsuits." *House*, 385 F. Supp. 3d at 623. This tends to confirm Plaintiffs' improper purpose for filing, as does the subsequent activity of Plaintiffs' counsel. The attorneys who filed suit against Akorn filed hundreds of actions involving the majority of all merger transactions from 2017-22. These suits did not arise from good faith mistakes about the materiality of GAAP reconciliations but arose from a business model based on extracting nuisance value for complaints that could never withstand judicial review.

The industrial-scale misuse of the judicial system merits judicial notice. The Court should order Plaintiffs (including their counsel) to show cause their conduct should not be sanctioned.

### A. None of the complaints pleaded material errors or omissions.

A table of the Alleged Omissions pleaded by each Plaintiff is shown below. They are numbered to match the numbers assigned in the Court's 2019 order.

| Alleged Omission Pleaded by Plaintiff | Berg | Alcarez | Harris | House |
|---|---|---|---|---|
| **Content of Supplemental Disclosure Claimed to Moot Litigation (Complaint Ex. 3)** | | | | |
| 1. GAAP/non-GAAP reconciliation for management case projections | 54 | 47 | 28 | 37 |
| 8. Whether board discussed other securities litigation filed years earlier | - | - | - | - |
| 9. Details concerning offers involving Dr. Kapoor investment | 61 | 56 | - | - |
| **Pleadings Based on Factually Erroneous Premise** | | | | |
| 3. Whether J.P. Morgan's fees were contingent—they clearly were | 64 | 58 | - | - |
| **Unobtained Disclosures (non-material and not supplemented)** | | | | |
| 2. Basis for J.P. Morgan's growth rate, terminal value, discount rate | 55 | 53 | - | 43 |
| 4. J.P. Morgan's work/compensation from Fresenius | 65 | 58 | - | 46 |
| 5. Stand-alone strategic plan information | - | - | - | - |
| 6. Data for 2017 Management Case & forecasts used by J.P. Morgan | 54 | 47 | 32 | - |
| 7. Information about other potential buyers | 69 | - | - | - |
| 10. Akorn's projected net debt as of April 21, 2017 | 55 | 53 | 41 | - |
| 11. Timing/nature of post-merger employment offers/communications | 60 | 55 | - | - |
| 12. Confidentiality agreement with any other potential bidders | 69 | - | - | - |
| 13. Basis for Rai's Feb. 4 communication to Fresenius re: CVR offer | 70 | - | - | - |

Note that only the first three-listed Alleged Omissions (1, 8, and 9) were plausibly remedied by Akorn's Supplemental Disclosure. Other alleged deficiencies, including allegations by every Plaintiff, could not possibly have been mooted by the supplement. Plaintiffs' own conduct suggests they never believed these omissions material, because all Plaintiffs claimed that the Supplemental Disclosure rendered their complaints "moot."

*Walgreen* requires that supplemental disclosures in class settlements must be "plainly material" to justify the payment of attorneys' fees. 832 F.3d at 725. In contrast, "a class action that seeks only worthless benefits for the class should be dismissed out of hand." *Id.* at 725; *In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*, 869 F.3d 551, 556 (7th Cir. 2017). None of the demanded disclosures could have been material, let alone plainly material as the Seventh Circuit requires.[12]

### 1. Alleged Omissions 1-8 were exhaustively considered by the Court.

The Court already examined several of the Alleged Omissions, and these do not require further elaboration here. If anything, the Court's conclusions are even stronger today.

Alleged Omission 1, GAAP reconciliation, was demanded by all Plaintiffs. In addition to *Assad* and *Bushansky*, cited by the Court (*House*, 385 F. Supp. 3d at 619), other courts have subsequently agreed that non-GAAP metrics do not render disclosures misleading. *See Mack v. Resolute Energy Corp.*, No. 19-cv-77-RGA, 2020 U.S. Dist. LEXIS 46776, at *23 (D. Del. Mar. 18, 2020); *Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*, No. CV-21-01995-PHX-JJT, 2023 U.S. Dist. LEXIS 20571, at *57 (D. Ariz. Feb. 7, 2023). These precedents are sound because non-GAAP measurements like unlevered free cash flow (UFCF) and earnings before interest, tax, depreciation and amortization (EBITDA) are widely understood, so their provision to shareholders in explaining a board's decision-making could not somehow render a proxy misleading. In fact, House called the previously-disclosed UFCF figures

---

[12] Plaintiff House argued to the Seventh Circuit that the Court had misapplied the law in its disgorgement order, claiming that language from *Walgreen* was an "off-handed statement" or otherwise had no applicability to the *House* action. The Seventh Circuit rejected this argument, quoting the Court's order at length and signaling its agreement except that the Court's "reference to 'inherent authority' should have been to §78u-4(c)(1) and Rule 11, but with that change the analysis holds." *Alcarez*, 99 F.4th at 377. *Walgreen* applies upon filing complaints that may be "dismissed out of hand." It clearly applies.

the "holy grail of projections." No. 17-cv-5018, Dkt. 65 at 9. A Templar Knight, having discovered the Holy Grail and having achieved immortal life, has little use for hardened old pottery clay.

If anything, out-of-date projections would have been more likely to *mislead* shareholders because they did not update shareholders on the rapid deterioration of Akorn's finances, but repeated March's relatively rosy projection for 2017. Just three weeks later, Akorn reported that net income for the second quarter had declined to $2.5 million, compared to $41 million for the first quarter.[13] Unlike the Definitive Proxy and the Supplemental Disclosure, the July 31 quarterly report *did* noticeably alter Akorn's price—causing it to drop. Akorn eventually posted a net *loss* of $24.6 million for 2017.[14]

The disclaiming Plaintiffs' unique demands seek particular details of no relevance such as the *timing* of employment offers and director's reasoning for certain actions, none of these are material.

### 2. Alleged Omission 9: Fresenius's offers to Kapoor described accurately.

Berg and Alcarez asserted that the Preliminary Proxy was misleading because it did not disclose whether Dr. Kapoor received or accepted a voting agreement after Fresnius asked Dr. Kapoor on March 20, 2017 to invest 20% of his proceeds from the merger in the combined company. *See* Preliminary Proxy, Ex 1 at 34. But proxies do not need to list things that did *not* happen. "If a disclosure document does not say that the board or its advisors did something, then the reader can infer that it did not happen." *In re Sauer-Danfoss*, 65 A.3d 1116, 1132 (Del. Ch. 2011). The Definitive Proxy succinctly elaborated, stating there were "no other substantive discussions" with Dr. Kapoor regarding his investment in Fresnius following his rejection of an investment proposal. See Preliminary Proxy, Ex 1 at 34. The Supplemental Disclosure includes the additional material sought by Plaintiffs, and this simply confirms there were no other substantive discussions. An offer on April 2, 2017 involved a similar request for Kapoor's $200 million investment (20% of estimated proceeds) and reached the same result described in the Definitive Proxy: no agreement regarding any investment was ever entered into. Definitive Proxy, Ex. 2 at 34, 77.

---

[13] www.sec.gov/Archives/edgar/data/3116/000162828017007466/akorn10q-06302017.htm.

[14] www.sec.gov/Archives/edgar/data/3116/000162828018002518/akorn10k12312017.htm.

That the April 2, 2017 investment proposal was tied to a $34.50 share price doesn't change matters. The board discussed the "lack of specificity of the investment proposal and the legal risks and other uncertainties related to the timing and structure of this proposal." Ex. 3. Sketchy and factually impossible offers from Fresenius have no material bearing on the offer Akorn shareholders were actually presented. Plaintiffs may argue that the sketchy $34.50 or $33.00 plus contingent value right (CVR) offer could have been material because they were "higher offers." But the $34.50 price was contingent on Kapoor's investment, and the $33.00 plus $2.00 CVR was contingent on meeting certain FDA deadlines and "unspecified product sales targets," both rejected. These offers were not even the highest proposals, as the Preliminary Proxy also recounted a $30.00 plus $5.00 CVR offer proposed on November 23, 2016, and a $30.00-$33.00 plus $2.00 CVR offer proposed on January 3, 2016, and a $32.00 plus $4.00 CVR offer proposed on February 3, 2017, all with varying conditions. Ex. 1 at 29-31. "[F]or price negotiations, the exact value of every rejected proposal may not need to be recounted in the proxy materials if the overall negotiation process is disclosed 'in sufficient detail' such that stockholders can reasonably determine whether the final, agreed-upon price 'is the product of arms' length negotiations and whether these negotiations succeeded in maximizing shareholder value." *Frank v. Elgamal*, 2014 Del. Ch. LEXIS 37, *112-113, 2014 WL 957550 (Del. Ch. 2014).

Therefore, additional details of rejected investment proposals did not change the "total mix of information" for shareholders in deciding to vote on the merger. *TSC Indus.*, 426 U.S. at 449. "The materiality standard requires courts to assess the value of the omitted information in light of all the information made available to shareholders." *Kuebler v. Vectren Corp.*, 13 F.4th 631, 642 (7th Cir. 2021). Given that the Preliminary Proxy outlines multiple offers from November 2016 until April 2017 that were equal or greater than the two offers added in the Supplemental Disclosure, it is not likely that a reasonable shareholder would "consider [these offers] important in deciding how to vote." *TSC*, 426 U.S. at 449. In fact, it is evident that shareholders did not consider it important, because over 99.8% of shareholders voted to approve the merger despite the inclusion of such offers in the Supplemental Disclosure. The vote confirms that this extraneous information regarding the merger negotiations simply didn't matter to shareholders. *See Walgreen*, 832 F.3d at 723.

### 3. Alleged Omission 10: net debt from J.P. Morgan's analysis

The Court previously examined the alleged omission of several metrics from J.P. Morgan's Discounted Cash Flow Analysis. *House*, 385 F. Supp. 3d at 620 (Alleged Omission 2). The disclaiming plaintiffs simply flagged an additional metric: "projected net debt as of April 21, 2017." This tidbit is no more material than the others. "Generally, with respect to data underlying a financial advisor's opinion, courts find that only a 'fair summary' must be disclosed, meaning that the company 'does not need to provide sufficient data to allow the stockholders to perform their own independent valuation.'" *Id.* (quoting *Trulia*, 129 A.3d at 901). "[S]hareholders are not entitled to the disclosure of every financial input used by a financial advisor so that they may double-check every aspect of both the advisor's math and its judgment." *Kuebler v. Vectren Corp.*, 13 F.4th 631, 643-44 (7th Cir. 2021) (citing cases). Projected net debt is exactly the sort of "specific details of the analysis underlying a financial advisor's opinion" not necessary to provide a fair summary of the opinion. *In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at *11 (Del. Ch. Feb. 29, 2012).

### 4. Alleged Omission 11: post-merger employment offers not omitted

Berg and Alcarez each complained that timing and communications of agreements for post-merger employment were not disclosed. The more detailed pleading, Berg's, claims that "[t]his information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders." Dkt. 1 ¶ 60.

The Preliminary Proxy already disclosed there were no such agreements that would have impaired officer or board judgement. "[T]here are no employment, equity contribution or other agreements, arrangements or understandings between any of the Company's directors or executive officers, on the one hand, and Fresenius Kabi, on the other hand, and the merger is not conditioned upon any of the Company's directors or executive officers entering into any such agreement, arrangement or understanding." Ex. 1 at 52-53. While Fresenius agreed that up to $8 million in bonuses would be made to retain employees, including officers, as of May 22, 2017 "no determinations have been made as to whether any executive officer will receive an award, the payment and other

terms of any such potential awards or the amounts of any such potential awards to any particular individual." *Id.* Therefore, the April 24, 2017 merger agreement was struck without any post-merger employment agreements in place.

Assuming such communications existed—and Plaintiffs cited no reason to think they had—they would not be material "unless plaintiffs allege facts from which it reasonably can be inferred that such discussions occurred during the sale process." *English v. Narang*, No. 2018-0221-AGB, 2019 WL 1300855, 2019 Del. Ch. LEXIS 94, at *30 (Del. Ch. Mar. 20, 2019). In *Narang*, plaintiffs argued their inference was supported by announcements that officers would be retained after closing. "This inference makes sense, of course, but misses the key point." *Id.* at *31. A conflict of interests only exists when "a fiduciary of the Company … had a motive to play favorites *during the sale process* in order to secure post-close employment." *Id.* (emphasis in original). "In other words, to be material, post-close employment discussions must have occurred before the Merger Agreement was signed … which was more than six weeks before the Form 8-K disclosure." *Id.* An analogous situation exists here, but in spades. No post-merger employment agreements existed at all, and Plaintiffs cannot even offer the "speculative" inference raised by plaintiffs in *Narang*, since no post-merger employment ever occurred.

### 5. Alleged Omission 12: confidentiality agreements are standard

As for Berg's demand to know whether confidentiality agreements were entered into with other potential bidders besides Fresenius, this is less substantive variation of Alleged Omission 7, demanding disclosure of other potential bidders, which the Court rightly rejected. *House*, 385 F. Supp. 3d at 622. Again, "[i]f a disclosure document does not say that the board or its advisors did something, then the reader can infer that it did not happen." *Sauer-Danfoss*, 65 A.3d at 1132.

### 6. Alleged Omission 13: the board obviously wanted a better offer

Finally, plaintiff Berg complained that the company should disclose "Rai's basis for informing Fresenius on February 4, 2017 that Akorn 'was willing to proceed …' only if Fresenius removed the significant contingent value right component from the proposed merger consideration." Dkt. 1, ¶ 70. The Preliminary Proxy adequately explained the board's position that Fresenius needed to "improve[]

its proposal without the inclusion of a CVR." Ex. 1 at 32. The board obviously believed shareholders would benefit from a firm cash price without the need to meet sales targets. *Id.* at 31.

### B. Plaintiffs offer no reason to believe they are responsible for the Definitive Statement, which contradicts their prior conduct and representations.

Plaintiffs may argue that their litigation produced not only the July 10, 2017 Supplemental Disclosure, but that they are also responsible for changes in the June 15 Definitive Proxy. Such argument contradicts post-June 15 representations that the proxy statements remained inadequate (Dkts. 38 at 3) and that Plaintiffs repeatedly and consistently claimed the Supplemental Disclosure—not the Proxy Statement—mooted their complaints. *See* Dkt. 54 at 4 (July 14, 2017); Dkt. 56 at 5 (September 15); Dkt. 78 at 4 (October 18). Plaintiff Berg only claimed responsibility for the Proxy Statement six months after the fact (Dkt. 84) and Plaintiffs provide no reason to believe their unsworn assertion to have precipitated the June 15 Proxy Statement.[15]

In any event, the Court need only evaluate Plaintiffs' pleadings. In its 2019 disgorgement order, the Court examined "whether the disclosures Plaintiffs sought in their complaints—not the disclosures Akorn made after the complaints were filed in the revised proxy and Form 8-K—are plainly material." *House*, 385 F. Supp. 3d at 619. The same evaluation should occur to evaluate compliance with Rule 11(b), where only the signed "pleading" trigger potential sanctions, not other imagined disclosures that Plaintiffs might belatedly conjure up.

### C. The Supplemental Disclosures could not possibly have mooted Plaintiffs' pleadings, suggesting counsel simply needed an excuse to seek fees.

All Plaintiffs claimed the Supplemental Disclosures rendered their pending complaints moot, but the vast majority of their pleaded omissions were not rectified by the supplement. For example, all Plaintiffs except Harris pleaded that the growth and discount rates used in J.P. Morgan's

---

[15] Plaintiffs may claim, as House did for the first time on appeal, that the Definitive Proxy's inclusion of the earlier November 2016 Management Case projection would have showed investors Akorn's downward trajectory. Plaintiffs cannot explain how inclusion of this projection would have materially altered the total mix of information provided. The June 15 Proxy Statement did not move the market. And this is unsurprising; the more recent and pessimistic March 2017 Management case was already disclosed by the Preliminary Proxy. Ex. 1 at 48-49.

Discounted Cash Flow Analysis were unexplained. Each complaint pleaded that these alleged omissions were material. The Supplemental Disclosure did not reveal or address them.

In fact, the Supplemental Disclosure failed to cure most deficiencies Plaintiffs had pleaded, because none of the sought disclosures were material. Thus, none of the disclosures would justify mootness fees even if the complaints had been filed before the Delaware Chancery—let alone under Federal procedure, which provide no such fees. *Cf. Walgreens*, 832 F.3d at 725 ("it's not enough that the disclosures address the misrepresentation or omissions: they must correct them."). No basis for mootness fees exists under federal law. The PSLRA limits fee awards to "a reasonable percentage" of class recovery, which is $0 here. 15 U.S.C. § 78u-4(a)(6). Further, federal laws generally do not permit attorneys' fees under catalyst theory. *Parshall v. Stonegate Mortg. Corp.*, 2017 WL 3530851, at *1 (S.D. Ind. Aug. 11, 2017) (dismissing case where plaintiffs tried to retain jurisdiction for mootness fees).

Given that most of the alleged omissions were abandoned in favor of claiming to have "mooted" the complaints, the only reasonable inference is that Plaintiffs knew that they filed frivolous "kitchen sink" complaints for an improper purpose: as a pretext to obtain attorneys' fees. Having executed their racket, Plaintiffs did not care whether the Supplemental Disclosures mooted anything.

## III. The Court has discretion to fashion appropriate remedies.

Plaintiffs will likely argue that that the motion should be denied as "moot" because most the Plaintiffs long ago disclaimed their entitlement to attorneys' fees, and House complied with the order to disgorge attorneys' fees to a company now in bankruptcy proceedings. Plaintiffs are mistaken.

"PSLRA's text **requires** that some sanction be imposed where, as here, a party violates Rule 11." *Scott v. Vantage Corp.*, 64 F.4th 462, 477 (3d Cir. 2023) (affirming Rule 11 violation and vacating denial of sanctions) (emphasis added). While it is true that attorneys' fees are beyond the reach of Plaintiffs, Frank asks the Court to consider other sanctions designed to prevent further misuse of the judicial process by Plaintiffs' counsel. These include:

1. Formally finding that counsel did indeed violate § 78u-4(c)(1) and Rule 11 by filing complaints for an improper purpose, and confirming the disgorgement order under these provisions. (The panel opinion suggests the Court must reissue its disgorgement

order on these grounds, after providing Plaintiffs the process they are entitled under Rule 11. *Alcarez*, 99 F.4th at 377.)

2.  Requiring all signing Plaintiffs' counsel and their firms to disclose and cite the finding, along with the *Alcarez* opinion, in any future lawsuits or demand letters concerning corporate merger transactions, including tender offers. *Cf. Inv. Mgmt. Ab v. Symantec Corp.*, No. C 18-02902 WHA, 2021 WL 1540996, 2021 U.S. Dist. LEXIS 77040 (N.D. Cal. Apr. 20, 2021) (order requiring plaintiffs' firm to disclose its decision concerning questionable securities suit conduct to judges and counsel in future securities cases).

3.  Requiring counsel to disclose retention agreements with the Plaintiffs; the racket only persists due to the stream of purported shareholders, and retention agreements may reveal an undisclosed kickback of "attorneys' fees."

4.  Requiring counsel to disclose all purported mootness fees extracted by them in similar suits and demand letters, which will allow courts, academics, and lawmakers to evaluate the scope of the problem and whether reforms should be enacted to curb the conduct.

5.  Imposing monetary penalties, whether to Frank's counsel or the Court.

The past disclaimer/disgorgement of attorneys' fees renders none of these sanctions moot or impossible. In fact, the Seventh Circuit remanded precisely so that Frank could seek this sort of injunctive relief. *Alcarez*, 99 F.4th at 375. Nor do Frank's suggested sanctions interfere with counsel's ability to represent clients in future cases.

The Court has discretion in "selecting an appropriate remedy (if any)," following "resolution of the proceedings under § 78u-4(c)(1) and, derivatively, Rule 11." *Id.* at 377. Frank suggests possible relief in this motion to demonstrate that relief is not moot or impossible as certain Plaintiffs' counsel have asserted.

## CONCLUSION

As outlined by the Seventh Circuit, the Court should reopen Plaintiffs' cases under Rule 60(b) so that it can perform the mandatory evaluation under § 78u-4(c)(1) and, derivatively, Rule 11. In order to move the proceedings along, the Court should order the Plaintiffs to show cause why they should not be sanctioned for filing frivolous complaints for an improper purpose. Following the required Rule 11 hearing, if a violation is found, the Court should enter appropriate sanctions.

Dated: July 8, 2024

*/s/ M. Frank Bednarz*
M. Frank Bednarz, (ARDC No. 6299073)
HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1440 W. Taylor St # 1487
Chicago, IL 60607
Phone: (801) 706-2690
Email: frank.becnarz@hlli.org

*Attorneys for Theodore H. Frank*

## CERTIFICATE OF SERVICE

The undersigned certifies he electronically filed the foregoing Memorandum in Support of Motion for Relief Under Rule 60(b) and for the Court to Issue an Order to Show Cause that Plaintiffs and their Counsel Shound Not Be Sanctioned Pursuant to 15 U.S.C. § 78u-4(c)(1) and Rule 11 via the ECF system for the Northern District of Illinois, thus effecting service on all attorneys registered for electronic filing.

Dated: July 8, 2024

/s/ M. Frank Bednarz